UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EXECUTIVE RISK INDEMNITY INC., Plaintiff, | [redacted] 05 169 T |
| v. | Civil Action No: |
| LIFESPAN CORPORATION, and RHODE ISLAND HOSPITAL Defendants. | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Executive Risk Indemnity Inc., brings this action against Lifespan Corporation and Rhode Island Hospital to obtain a Declaratory Judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 concerning an actual controversy between the parties. The controversy between the parties concerns their respective rights and obligations with regard to a Directors, Officers and Trustees Liability Insurance Including Healthcare Organization Reimbursement Policy issued to Lifespan Corporation by Executive Risk Indemnity Inc. The controversy concerns the availability, if any, of coverage for costs, including legal fees, allegedly incurred by Lifespan Corporation and Rhode Island Hospital in responding to a civil action commenced under the False Claims Act, 31 U.S.C. §§3730(b)(2) and (4), and a preceding subpoena issued by the United States Department of Health and Human Services, Office of Inspector General.

## PARTIES

1. Plaintiff, Executive Risk Indemnity Inc. ("ERII"), is an insurance company organized and existing under the laws of Delaware, with a principal place of business in Warren, New Jersey.

2. Defendant Lifespan Corporation ("Lifespan Corp.") is a corporation organized and existing under the laws of Rhode Island, with a principal place of business in Providence, Rhode Island.

3. Defendant Rhode Island Hospital ("RIH") is a corporation organized and existing under the laws of Rhode Island, with a principal place of business in Providence, Rhode Island.

## JURISDICTION AND VENUE

4. This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

5. Venue is proper in the United States District Court for the District of Rhode Island pursuant to 28 U.S.C. § 1391 because Lifespan Corp. and RIH are residents of this judicial district and a substantial part of the events or alleged omissions giving rise to this action occurred in this judicial district.

## NATURE OF THE CLAIM

6. This is an action for Declaratory Judgment pursuant to 28 U.S.C. § 2201 for the purpose of construing and interpreting the terms of an insurance contract and for a determination of the parties' respective rights and obligations under the insurance contract issued by ERII to Lifespan Corp. An actual controversy exists regarding the extent of coverage afforded Lifespan

Corp. and RIH (collectively, "Lifespan") under the insurance contract issued by ERII for legal fees, settlement and other costs allegedly incurred by Lifespan.

## FACTS

### The Insurance Policy and Relevant Provisions

7. ERII issued Directors, Officers and Trustees Liability Insurance Including Healthcare Organization Reimbursement Policy No. 751-080581-97 to Lifespan for the policy period October 1, 1997 through October 1, 1998 (the "Policy"). A true copy of the Policy is attached hereto as Exhibit A.

8. The Policy is written on a "claims made" basis with the result that it applies only to **Claims**,[1] as defined, first made during the **Policy Period**, subject to all Policy terms, conditions and limitations. The Policy provides reimbursement for **Loss**, including **Defense Expenses**, as defined, and expressly states that it does not "provide for any duty by the **Underwriter** to defend any **Insured**."

9. The Policy contains three Insuring Agreements. Insuring Agreement C, the insuring agreement at issue here, calls for ERII, the **Underwriter**, to "pay on behalf of the **Insured Entity Loss** from **Claims** first made against it during the **Policy Period**" subject to applicable Policy terms, conditions and limitations.

10. The Policy defines **Insured Entity** to include "the **Parent Organization** and any **Subsidiary** as of the **Inception Date**" of the Policy. Lifespan Corp. is the **Parent Organization** designated in the Policy. RIH is a Lifespan Corp. **Subsidiary**. Consequently, Lifespan Corp. and RIH each qualifies as an **Insured Entity** under the Policy.

11. The coverages afforded under the Policy are subject to a $25,000,000.00 maximum aggregate **Limit of Liability** for all **Claims** made during the **Policy Period**, subject to

[1] All terms shown in bold are defined Policy terms.

satisfaction of specified per **Claim** retentions. The retention for Insuring Agreement C is $100,000.00 per **Claim**.

12. The Policy defines **Claim** to mean "(1) written notice received by an **Insured** that any person or entity seeks to hold any **Insured** responsible for a **Wrongful Act**, or (2) a legal, injunctive or administrative proceeding against an **Insured Person** solely by reason of his or her status as such."

13. The Policy defines **Wrongful Act** to mean "any actual or alleged error, omission, misstatement, misleading statement or breach of duty (1) by an **Insured Person** solely in his or her capacity as such, or while serving as a director or trustee of any other non-profit entity at the express written direction of the **Insured Entity**; or (2) with respect to coverage under Insuring Agreement C, by the **Insured Entity**."

14. The Policy states in Section IV(F)(1) that "If during the **Policy Period** any **Claim** is made, as a condition precedent to their right to payment the **Insureds** shall give the **Underwriter** written notice by certified mail of such **Claim** as soon as practicable after such **Claim** is first made."

15. The Policy states in Section IV(F)(2) that "If during the **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** against any **Insured** and, as soon as practicable thereafter but before expiration or cancellation of the **Policy**, gives the **Underwriter** written notice by certified mail or such circumstances with full particulars of the specific **Wrongful Act** involved, then any **Claim** subsequently made against an **Insured** arising out of such **Wrongful Act** shall be deemed made during the **Policy Period**."

16. The Policy defines **Loss** to mean "any amount, including **Defense Expenses**, in excess of the applicable retention and not exceeding the **Limit of Liability** which an **Insured** is obligated to pay as a result of a **Claim**, except that **Loss** shall not include punitive or exemplary

damages, the multiplied portion of any multiplied damage award, fines, taxes or penalties, and matters which are deemed uninsurable under the law pursuant to which this Policy shall be construed."

17. The Policy defines **Defense Expenses** to mean "reasonable legal fees and expenses incurred by an Insured in defense of a **Claim**, except that **Defense Expenses** shall not include remuneration, overhead or benefit expenses associated with any **Insured**."

18. Section III(A) of the Policy expressly and unambiguously excludes from coverage the following: "Except for **Defense Expenses**, the **Underwriter** shall not pay **Loss** for **Claims** brought by or contributed to in fact (1) by any dishonest or fraudulent act or omission or any willful violation of any statute, rule or law by any **Insured** or (2) by any **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled. For the purpose of determining the applicability of this III.EXCLUSION (A), no **Wrongful Act** of any **Insured Person** shall be imputed to any other **Insured Person**. Further, each **Insured** agrees that, if it is finally established that the **Underwriter** has no liability to an **Insured** for **Loss** in connection with any **Claim** by reason of this III.EXCLUSION (A), such **Insured** will repay the **Underwriter** upon demand all **Defense Expenses** paid on behalf of such **Insured** in connection with such **Claim**."

19. As an express condition of coverage, the Policy states in Section IV(A) that "It shall be the duty of the **Insureds** and not the duty of the **Underwriter** to defend **Claims**. No **Defense Expenses** shall be incurred and no settlement of any **Claim** shall be made without the **Underwriter's** consent, such consent not to be unreasonably withheld."

**The Subpoena Duces Tecum**

20. On or about March 23, 1998, the United States Department of Health and Human Services, Office of Inspector General, issued a subpoena duces tecum to the Custodian of the

Records of Rhode Island Hospital, a Lifespan Corp. subsidiary (the "Subpoena"). The Subpoena directed RIH to produce specified documents and information in connection with "an investigation of possible false or otherwise improper claims for payment under Title XVIII (Medicare) of the Social Security Act."

21. The Subpoena did not assert any intent to hold Lifespan responsible for any alleged **Wrongful Acts** as defined in the Policy.

22. Almost five (5) months later, Lifespan by letter dated August 10, 1998 provided ERII with written notice of a potential claim under the Civil False Claims Act by reason of RIH's March 23, 1998 receipt of the Subpoena. Lifespan's notice of potential claim characterized the Subpoena as seeking "certain medical records of patients admitted with pneumonia and for records relating to billing and coding of pneumonia admissions." Lifespan subsequently provided ERII with a copy of the Subpoena under transmittal letter dated September 3, 1998. True copies of Lifespan's August 10, 1998 and September 3, 1998 correspondence, with enclosed Subpoena, are attached hereto as Exhibits B and C.

23. By letter dated August 17, 1998, ERII acknowledged receipt of Lifespan's notice of potential claim and stated that it would address the application of the Policy to the issues raised in Lifespan's correspondence while maintaining a complete reservation of rights. A true copy of ERII's August 17, 1998 letter is attached hereto as Exhibit D.

24. By letter dated September 24, 1998, ERII advised Lifespan that the Subpoena did not constitute a **Claim** as defined by the Policy. ERII informed Lifespan in that letter that "[s]ince no Claim has been made, there is presently no coverage under the insuring agreements." ERII stated that it would "treat this matter as a notice of a fact, circumstance or event which may lead to a Claim." A true copy of ERII's September 24, 1998 letter is attached hereto as Exhibit E.

25. Defendants did not respond to inquiries from ERII concerning any subsequent developments with regard to the matters addressed in the Subpoena. Defendants did not provide ERII with any information concerning their response, if any, to the Subpoena. Defendants did not inform ERII of any subsequent investigative request or asserted intent to hold Lifespan responsible for alleged **Wrongful Acts** following their receipt of the Subpoena.

26. In December 1999, ERII closed its file regarding this notice of potential claim because no further information concerning this matter had been provided by Lifespan.

27. Defendants did not respond to or otherwise express any disagreement with ERII's September 24, 1998 notification that the Subpoena does not qualify as a **Claim** for which **Defense Expense** or any other coverage would be available *until six years later* -- in the fall of 2004 -- after a dispute arose between the parties concerning ERII's denial of coverage for amounts paid by Lifespan to settle the subsequently filed False Claims Act Action, addressed below.

28. Contrary to the position later taken by Lifespan, reimbursement is not available for legal fees incurred by Lifespan in responding to the Subpoena because the Policy clearly and unambiguously (a) distinguishes between a **Claim** and notice of potential claim, and (b) limits **Defense Expense** coverage to "reasonable legal fees and expenses incurred by an **Insured** in defense of a **Claim**." Consequently, the Policy does not afford any right to reimbursement of costs incurred in responding to a notice of potential claim, irrespective of whether a **Claim** subsequently made against an **Insured** is deemed to relate back to the Policy in effect when the **Insured** provides notice of a potential claim under Section IV(F)(2).

**The Civil False Claims Act Action**

29. On or about November 19, 2002, the United States of America filed an intervenor complaint against RIH in a *qui tam* action initiated by Health Outcomes Technology to recover

triple damages and penalties for violations of the Federal Civil False Claims Act, 31 U.S.C. §§3729-3733, and in the alternative, to recover damages for unjust enrichment, payment by mistake and recoupment (the "False Claims Act Action"). The False Claims Act Action was filed in the United States District Court for the District of Rhode Island as *United States of America, ex rel. Health Outcomes Technologies v. Rhode Island Hospital*, C.A. No. 01-243-ML. A true copy of the Complaint in the False Claims Act Action is attached hereto as Exhibit F.

30. The Federal Civil False Claims Act, 31 U.S.C. §§3729-3733A, provides for the award of civil monetary penalties plus three times the amount of damages which the Government sustains because of the submission of false claims. The False Claims Act thus requires that the defendant return amounts improperly obtained through the submission of false claims, trebled under the Act.

31. In November 2002, Lifespan notified ERII of the inception of the False Claims Act Action for which it was seeking coverage.

32. By letter dated December 5, 2002, ERII acknowledged receipt of the False Claims Act Action and advised Lifespan that it was reserving all rights and defenses while investigating the potential availability of coverage for the Action.

33. By later dated June 26, 2003, ERII advised Lifespan that its investigation into the potential availability of coverage was continuing under a full and complete reservation of rights. ERII requested that Lifespan promptly provide copies of all fees statements received and paid to date by Lifespan in connection with the defense of the False Claims Act Action, including fees statements within the policy's retention. ERII also requested that Lifespan provide it with information regarding defense counsel retained to represent RIH in the False Claims Act Action in accordance with the consent requirements of the Policy, Section IV(A)(1). ERII provided

Lifespan with its written Litigation Management Guidelines addressing the requirements for and limitations on **Defense Expense** reimbursement.

34. Unaware at that time of the relation between the False Claims Act Action and the prior Subpoena, ERII initially treated the submission of the False Claims Act Action as a **Claim** under a policy issued to Lifespan for the period October 21, 2002-October 21, 2003.

35. In September 2003, ERII learned that the False Claims Act Action related to the notice of potential claim provided under the 1997-1998 Policy. By letter dated September 10, 2003, ERII advised Lifespan that the False Claims Act Action would be deemed a **Claim** under the 1997-1998 Policy pursuant to Section IV(F)(2) of that Policy.

36. ERII informed Lifespan in its September 10, 2003 letter that "the only potential damages available under the False Claims Act and related common law theories alleged in the Litigation constitute disgorgement of an amount wrongfully received, multiplied damages of such an amount and/or penalties. As noted above, none of those categories of payments is potentially covered under the Policy. As such, ERII is not in a position to contribute toward any settlement of the Litigation." A true copy of ERII's September 10, 2003 correspondence is attached as Exhibit G.

37. ERII informed Lifespan in its September 10, 2003 correspondence that "subject to a full and complete reservation of rights, the Policy will provide reimbursement for Defense Expenses subject to the Policy's $100,000 per Claim retention." ERII directed Lifespan's attention to Policy Section III, Exclusion (A) which further provides that "each **Insured** agrees that, if it is finally established that the **Underwriter** has no liability to an **Insured** for **Loss** in connection with any **Claim** by reason of this III. Exclusion (A), such **Insured** will repay the **Underwriter** upon demand all **Defense Expenses** paid on behalf of such **Insured** in connection with such **Claim**."

38. Defendants did not respond to ERII's September 10, 2003 correspondence or otherwise take issue, at that time, with ERII's determination that the Policy did not afford coverage for any amounts sought in the False Claims Act Action.

39. By letter dated October 17, 2003, ERII requested that Lifespan provide a status update regarding the False Claims Act Action. In response, Lifespan advised ERII by email dated October 22, 2003 that the False Claims Act Action had been settled for $625,000.00. Lifespan also informed ERII in its email communication that it disagreed with ERII's coverage position and would forward correspondence regarding same.

40. Lifespan did not request ERII's consent under Policy Section IV(A)(1) before entering into the settlement. ERII did not participate in any settlement negotiations. ERII was not asked to, and never agreed to, contribute toward the settlement of the False Claims Act Action.

41. After learning of the settlement, ERII reiterated that the Policy did not afford indemnification coverage for the False Claims Act Action, or any settlement thereof, because the only relief available under the False Claims Act and related common law claims consists of penalties, multiplied damages, and the restitution of amounts to which a defendant is not legally entitled, which fall squarely within the express and unambiguous limitations and Exclusion set forth in Policy Section II(C) and III(A).

42. Based upon the claims asserted in the False Claims Act Action, there is no potential that any portion of the $625,000.00 settlement amount concerns anything other than the penalty, multiplied damages, and/or restitutionary forms of relief. The applicable Policy terms, conditions and Exclusions unambiguously eliminate any potential for coverage for such relief, as well as any amounts paid to settle claims for such relief.

43. By letter dated June 3, 2004, ERII reminded Lifespan that it still had not received any invoices for which Lifespan was seeking **Defense Expense** reimbursement with regard to the False Claims Act Action, despite requests first made in June 2003.

44. Lifespan thereafter submitted invoices that concerned services rendered in connection with the False Claims Act Action as well as the preceding Subpoena. ERII informed Lifespan that it was not entitled to reimbursement of legal fees and expenses allegedly incurred in responding to the preceding Subpoena because the Policy does not afford **Defense Expense** reimbursement for (a) amounts incurred with regard to a notice of potential claim; or (b) any other amounts incurred prior to receipt of a **Claim.**

45. ERII subsequently reimbursed Lifespan for $128,448.98 in **Defense Expenses** incurred with regard to the False Claims Act Action. ERII informed Lifespan that reimbursement is not available for the remaining legal fees submitted by Lifespan because they concern (a) services allegedly rendered before the False Claims Act Action commenced in November 2002, or (b) fees and costs which do not comply with ERII's Litigation Management Guidelines.

**COUNT I – DECLARATORY RELIEF**

46. All of the foregoing allegations are realleged and incorporated by reference herein.

47. Based on the foregoing allegations, ERII respectfully requests that this Court adjudicate the controversy that has arisen between the parties and make a final and binding declaration regarding the application of the Policy to the claims asserted in the False Claims Civil Action, and in that regard declare and decree that:

A. Defendants are not entitled to indemnification coverage for amounts paid to settle the False Claims Act Civil Action because:

1. The Policy unambiguously and expressly precludes coverage for the only types of relief available under the False Claims Act and related common law claims asserted in the False Claims Act Civil Action because (a) restitutionary relief does not qualify as **Loss**; (b) such amounts represent "punitive or exemplary damages, the multiplied portion of any multiplied damages award, fines, taxes or penalties, an matters which are uninsurable under the law pursuant to which this Policy shall be construed" which are excluded from coverage in the **Loss** definition; and (c) such amounts fall within the Policy's Exclusion in Section III(A) for "**Loss** brought about or contributed to in fact (1) by any dishonest or fraudulent act or omission or any willful violation of any statute, rule or law by any **Insured** or (2) by any **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled."

2. Defendants did not seek, or obtain, ERII's prior consent to the settlement of the False Claims Civil Action and ERII never agreed to pay any portion of the settlement of the False Claims Act Action; and

3. Defendants cannot demonstrate that the False Claims Civil Action sought any relief other than penalties, multiplied damages, and/or restitution for which there is no potential for coverage under the Policy and thus cannot establish that there is any potential for coverage under the Policy for amounts paid to settle the False Claims Act Civil Action.

B. Defendants are not entitled to reimbursement of legal fees and expenses allegedly incurred in responding to the Subpoena because:

1. The Policy does not afford **Defense Expense** reimbursement for amounts incurred in responding to a notice of potential claim irrespective of whether the **Insured** subsequently receives a **Claim** that is deemed to relate back to the **Policy Period** in effect when notice is provided of a potential claim; and

2. The Subpoena does not qualify as a **Claim** under the Policy because it did not seek to hold defendants responsible for **Wrongful Acts.**

C. Defendants are not entitled to reimbursement of legal fees and expenses which do not comply with ERII's written Litigation Management Guidelines.

D. ERII respectfully requests that this Court grant it such other and further relief as may be deemed just and appropriate.

Dated: April 22 2005

EXECUTIVE RISK INDEMNITY INC.,
By its attorneys,
Preston W. Halperin (by RL Souza)

Preston W. Halperin (# 5555)
Randall L. Souza (# 4082)
SHECHTMAN HALPERIN SAVAGE, LLP
86 Weybosset Street
Providence, RI 02903
(401) 272-1400
(401) 272-1403(fax)

Of Counsel:

Barbara A. O'Donnell
Nancy Cremins
ROBINSON & COLE LLP
One Boston Place
Boston, MA 02108
(617) 557-5900
(617) 557-5999 (fax)

Executive Risk Indemnity Inc.
Home Office
32 Loockerman Square, Suite L100
Dover, Delaware 19901

*Administrative Offices/Mailing Address:*
82 Hopmeadow Street
Simsbury, Connecticut 06070-7683

**THIS IS A CLAIMS MADE INDEMNITY POLICY WITH EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.**

## DECLARATIONS

POLICY NUMBER
751-080581-97

## DIRECTORS, OFFICERS AND TRUSTEES LIABILITY INSURANCE INCLUDING HEALTHCARE ORGANIZATION REIMBURSEMENT POLICY

**NOTICE: THIS IS A CLAIMS MADE INDEMNITY POLICY WHICH APPLIES ONLY TO ANY "CLAIM" FIRST MADE DURING THE "POLICY PERIOD" AGAINST THE "INSUREDS" FOR A "WRONGFUL ACT". THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED BY "DEFENSE EXPENSES", AND "DEFENSE EXPENSES" SHALL BE APPLIED AGAINST THE RETENTION. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE UNDERWRITER TO DEFEND ANY "INSURED". THE COVERAGE AFFORDED BY THIS POLICY DIFFERS IN SOME RESPECTS FROM THAT AFFORDED BY MOST OTHER POLICIES. PLEASE READ CAREFULLY.**

| ITEM 1. PARENT ORGANIZATION – NAME AND PRINCIPAL ADDRESS: | ITEM 2. POLICY PERIOD: |
|---|---|
| Lifespan Corporation<br>167 Point Street<br>Coro Building<br>Providence, RI 02903 | (a) Inception Date: October 1, 1997<br>(b) Expiration Date: October 1, 1998<br>at 12:01 a.m. at the Principal Address in ITEM 1. |

**ITEM 3. LIMIT OF LIABILITY** (Inclusive of **Defense Expenses**):
$ 25,000,000.00 maximum aggregate Limit of Liability for all **Claims** made during the **Policy Period**.

**ITEM 4. RETENTIONS** (Subject to IV. Condition (C) of the Policy):
(a) $0.00 each **Insured Person** each **Claim**, but in no event to exceed, in the aggregate,
$0.00 each **Claim** for all **Insured Persons** under Insuring Agreement A.
(b) $100,000.00 each **Claim** under Insuring Agreement B.
(c) $100,000.00 each Claim under Insuring Agreement C

**ITEM 5. PREMIUM:**
(a) Prepaid premium for coverage under Insuring Agreements A & B (included in (c) below).
(b) X Additional premium for coverage under Insuring Agreement C is included in (c) below; OR
_ No coverage is available under Insuring Agreement C.
(c) $165,000.00 Total Premium.

**ITEM 6. NOTICE REQUIRED TO BE GIVEN TO THE UNDERWRITER MUST BE ADDRESSED TO:**
Vice President of Claims
Executive Risk Management Associates
P. O. Box 2002
Simsbury, CT. 06070

**ITEM 7. ENDORSEMENTS ATTACHED AT ISSUANCE:**

| | | |
|---|---|---|
| C22901 | D21225 | D21529 |
| D21178 | D21279 | D22471 |
| D21187 | D21325 | D22651 |
| D21215 | D21414 | D22869 |
| D21217 | D21431 | D23129 |
| D21218 | D21499 | D24093 |

**These Declarations, the completed signed Application and the Policy with Endorsements shall constitute the contract between the Underwriter, the Insured Persons and the Insured Entity.**

EXECUTIVE RISK INDEMNITY INC. by (Attorney-in-Fact): October 15, 1997 Paul J. Romano

**THIS IS A CLAIMS MADE INDEMNITY POLICY WITH EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.**

# EXECUTIVE RISK INDEMNITY INC.

## DIRECTORS, OFFICERS AND TRUSTEES LIABILITY INSURANCE INCLUDING HEALTHCARE ORGANIZATION REIMBURSEMENT POLICY

**Executive Risk Indemnity Inc. (the "Underwriter"), the Insured Persons and the Insured Entity, subject to all of the terms, conditions and limitations of this Policy, agree as follows:**

## I. INSURING AGREEMENTS

(A) The Underwriter will pay on behalf of the **Insured Persons Loss** from **Claims** first made against them during the **Policy Period**, except for **Loss** which the **Insured Entity** pays to or on behalf of the **Insured Persons** as indemnification.

(B) The Underwriter will pay on behalf of the **Insured Entity Loss** from **Claims** first made against the **Insured Persons** during the **Policy Period** which the **Insured Entity** pays to or on behalf of the **Insured Persons** as indemnification.

(C) **[OPTIONAL COVERAGE]** If there is a premium charge in ITEM 5(b) of the Declarations, the Underwriter will pay on behalf of the **Insured Entity Loss** from **Claims** first made against it during the **Policy Period**.

## II. DEFINITIONS

Whenever used in this Policy:

(A) "**Application**" means the application attached to and forming part of this Policy, including any materials submitted therewith, which are on file with the Underwriter and are a part of the Policy, as if physically attached;

(B) "**Claim**" means (1) written notice received by an **Insured** that any person or entity intends to hold any **Insured** responsible for a **Wrongful Act**, or (2) a legal, injunctive or administrative proceeding against an **Insured Person** solely by reason of his or her status as such;

(C) "**Defense Expenses**" means reasonable legal fees and expenses incurred by an **Insured** in defense of a **Claim**, except that **Defense Expenses** shall not include remuneration, overhead or benefit expenses associated with any **Insured**;

(D) "**Insured**" means the **Insured Entity** and any **Insured Person**;

(E) "**Insured Entity**" means the **Parent Organization** and any **Subsidiary** as of the Inception Date, plus (1) any non-profit **Subsidiary** created or acquired during the **Policy Period** and (2), if the Underwriter agrees to provide such coverage under IV. CONDITION (G), any for-profit **Subsidiary** created or acquired during the **Policy Period**;

(F) "**Insured Person**" means any past, present or future director, officer, trustee, employee, volunteer, or any member of the staff, faculty or any duly constituted committee of the **Insured Entity**; and, in the event of the death, incapacity or bankruptcy of an **Insured Person**, the estate, heirs, legal representatives or assigns of such individual;

(G) "**Loss**" means any amount, including **Defense Expenses**, in excess of the applicable retention and not exceeding the Limit of Liability which an **Insured** is obligated to pay as a result of a **Claim**, except that **Loss** shall not include punitive or exemplary damages, the multiplied portion of any multiplied damage award, fines, taxes or penalties, and matters which are uninsurable under the law pursuant to which this Policy shall be construed;

(H) "**Parent Organization**" means the non-profit organization named in ITEM 1 of the Declarations;

(I) "**Policy Period**" means the period from the Inception Date to the Expiration Date in ITEM 2 of the Declarations or to any earlier cancelation date. Any extension of coverage under IV. CONDITION (E) shall be part of and not in addition to the **Policy Period**;

(J) "**Subsidiary**" means any entity of which the **Parent Organization** has or controls the right to elect or appoint more than fifty percent (50%) of the directors or trustees;

(K) "**Wrongful Act**" means any actual or alleged error, omission, misstatement, misleading statement or breach of duty (1) by an **Insured Person** solely in his or her capacity as such, or while serving as a director or trustee of any other non-profit entity at the express written direction of the **Insured Entity**; or (2) with respect to coverage under Insuring Agreement C, by the **Insured Entity**.

## III. EXCLUSIONS

(A) Except for **Defense Expenses**, the Underwriter shall not pay **Loss** for **Claims** brought about or contributed to in fact (1) by any dishonest or fraudulent act or omission or any willful violation of any statute, rule or law by any **Insured** or (2) by any **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled. For the purposes of determining the applicability of this III. EXCLUSION (A), no **Wrongful Act** of any **Insured Person** shall be imputed to any other **Insured Person**. Further, each **Insured** agrees that, if it is finally established that the Underwriter has no liability to an **Insured** for **Loss** in connection with any **Claim** by reason of this III. EXCLUSION (A), such **Insured** will repay the Underwriter upon demand all **Defense Expenses** paid on behalf of such **Insured** in connection with such **Claim**.

(B) The Underwriter shall not pay **Loss**, including **Defense Expenses**, for **Claims**:

(1) for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person, or damage to or destruction of any tangible property including loss of use thereof;

(2) based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged generation, storage, transportation, discharge, dispersal, escape, treatment, removal or disposal of any pollutant or contaminant, including without limitation waste, infectious or otherwise, and medical and pharmaceutical supplies;

(3) by or at the behest of the **Insured Entity**, except that this exclusion shall not apply to any derivative action brought totally independently of, and without the solicitation, assistance, participation or intervention of, any of the **Insureds**;

(4) based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance or situation (a) underlying or alleged in any prior and/or pending litigation as of the Inception Date, or (b) which has been the subject of any notice given before the Inception Date under any policy of insurance;

(5) for any actual or alleged violations of the Employee Retirement Income Security Act of 1974 or any regulations promulgated thereunder, or of any similar provisions of any federal, state or local law or regulation;

(6) against any **Subsidiary** and its **Insured Persons** in such capacity for any **Wrongful Act** occurring before the date such entity became a **Subsidiary**.

## IV. CONDITIONS

(A) **No Duty to Defend; Advancement of Defense Expenses:**

(1) It shall be the duty of the **Insureds** and not the duty of the Underwriter to defend **Claims**. No **Defense Expenses** shall be incurred and no settlement of any **Claim** shall be made without the Underwriter's consent, such consent not to be unreasonably withheld.

(2) The Underwriter shall, upon written request by an **Insured**, pay on a current basis **Defense Expenses** which are otherwise payable under this Policy, except to the extent that such **Defense Expenses** are being paid under the terms of any other policy or policies of insurance.

(B) **Other Insurance; Other Indemnification:**

This Policy shall be excess of and not contribute with (1) other existing insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically in excess of this Policy, and (2) indemnification to which an **Insured** is entitled from any entity other than the **Insured Entity**. This Policy shall not be subject to the terms of any other insurance.

(C) **Limit of Liability; Retention; Payment of Loss:**

(1) The amount stated in ITEM 3 of the Declarations shall be the maximum aggregate Limit of Liability of the Underwriter under the Policy for all **Loss** resulting from all **Claims** made during the **Policy Period**, regardless of the time of payment by the Underwriter. **Defense Expenses** shall be part of and not in addition to such Limit of Liability, and payment of **Defense Expenses** by the Underwriter shall reduce such Limit of Liability.

(2) All **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events shall be deemed to be a single **Claim** made at the time the earliest such **Claim** is made. A **Claim** shall be deemed made when the Underwriter is notified under IV. CONDITION (F) or when such **Claim** is first made or asserted against an **Insured**, whichever occurs first.

(3) If **Loss** from a **Claim** is covered under more than one Insuring Agreement, the applicable retention stated in ITEM 4 of the Declarations shall be applied separately to that part of the **Loss** covered by each Insuring Agreement, and the sum of such retentions shall be the retention applicable to such **Claim**. The total retention shall not exceed the largest retention stated in ITEM 4 of the Declarations. For purposes of determining the applicable retentions, **Loss** applicable to Insuring Clause B includes that for which indemnification by the **Insured Entity** is legally permissible, whether or not actual indemnification is made, except where such indemnification is not made by the **Insured Entity** solely by reason of its financial insolvency.

(4) Except for the payment of **Defense Expenses** as provided in IV. CONDITION (A)(2), the Underwriter shall pay or reimburse **Loss** only upon the final disposition of any **Claim**.

(D) **Cooperation; Subrogation:**

In the event of a **Claim**, the **Insureds** will provide the Underwriter with all information, assistance and cooperation that the Underwriter reasonably requests, and will do nothing that may prejudice the Underwriter's position or potential or actual rights of recovery. In the event of payment, the Underwriter shall be subrogated to all of the rights of recovery of the **Insureds**, who shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Underwriter effectively to bring suit in their name.

(E) **Discovery Period:**

If the Policy is canceled for any reason other than non-payment of premium or is not renewed by the Underwriter or the **Parent Organization**, the **Insureds** shall have the right to an extension of the coverage granted by this Policy for a period of 365 days after the date such cancelation or non-renewal takes effect (the "Termination Date"), but only with respect to any **Wrongful Act** before the Termination Date. The premium for such extension of coverage shall be forty percent (40%) of the total premium set forth in ITEM 5(c) of the Declarations, and must be paid within thirty (30) days of the Termination Date. Such extension of coverage shall be part of and not in addition to the **Policy Period**, and the Underwriter's aggregate Limit of Liability in respect of all **Claims** made during the **Policy Period**, including such extension of coverage, shall not exceed the available Limit of Liability set forth in ITEM 3 of the Declarations.

(F) **Notice of Claim or Circumstances:**

(1) If during the **Policy Period** any **Claim** is made, as a condition precedent to their right to payment the **Insureds** shall give the Underwriter written notice by certified mail of such **Claim** as soon as practicable after such **Claim** is first made.

(2) If during the **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** against any **Insured** and, as soon as practicable thereafter but before the expiration or cancelation of the Policy, gives the Underwriter written notice by certified mail of such circumstances with full particulars of the specific **Wrongful Act** involved, then any **Claim** subsequently made against an **Insured** arising out of such **Wrongful Act** shall be deemed made during the **Policy Period**.

(G) **Adjustments:**

If after the Inception Date the **Insured Entity** acquires or assumes all or substantially all of the equity, assets or liabilities of, or merges with, any for-profit entity, or creates a for-profit **Subsidiary**, there shall be no coverage under this Policy for **Loss** in connection with any **Claim** for **Wrongful Acts** arising out of or in any way relating to the entity, assets or liabilities acquired, assumed, merged with or created, unless (1) the Underwriter receives from the **Insured Entity** full details of such transaction or event and (2) the Underwriter, at its sole discretion, agrees by written endorsement to provide such coverage upon such terms, conditions and limitations as it may require.

(H) **Representations; Severability:**

The **Insureds** represent that the particulars and statements contained in the **Application** are true and agree that: (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the Underwriter; and (3) this Policy is issued in reliance upon the truth of such representations. The **Application** shall be construed as a separate application for coverage by each of the **Insureds**. Except for material facts or circumstances known to the person or persons who signed the **Application**, no statement in the **Application** or knowledge or information possessed by an **Insured** shall be imputed to any other **Insured** for the purpose of determining the availability of coverage.

(I) **No Action Against the Underwriter:**

(1) No action shall be taken against the Underwriter unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy and until the amount of the **Insureds**' obligation to pay shall have been finally determined either by judgment against the **Insureds** after adjudicatory proceedings, or by written agreement of the **Insureds**, the claimant and the Underwriter.

(2) No person or organization shall have any right under this Policy to join the Underwriter as a party to any **Claim** against an **Insured** to determine the liability of such **Insured**; nor shall the Underwriter be impleaded by an **Insured** or his, her or its legal representative in any such **Claim**. Bankruptcy or insolvency of any of the **Insureds** or of any of their estates shall not relieve the Underwriter of any of its obligations under this Policy.

(J) **Authorization and Notices:**

The **Insureds** agree that the **Parent Organization** shall act on their behalf with respect to receiving all notices and any return premiums from the Underwriter.

(K) **Changes:**

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Underwriter shall not effect a waiver or change in any part of this Policy or estop the Underwriter from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations of this Policy can only be waived or changed by written endorsement.

(L) **Assignment:**

Assignment of interest under this Policy shall not bind the Underwriter without its consent.

(M) **Cancelation:**

(1) The Underwriter may not cancel this Policy except for failure to pay a premium when due, in which case ten (10) days written notice will be given.

(2) The **Parent Organization** may cancel this Policy only by mailing the Underwriter written notice stating when such cancelation shall be effective. In such event, the earned premium shall be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancelation is effective or as soon as practicable after cancelation becomes effective, but payment or tender of unearned premium is not a condition of cancelation.

The Underwriter shall not be required to renew this Policy upon its expiration.

(N) **Exhaustion:**

If the Limit of Liability is exhausted by the payment of **Loss**, including **Defense Expenses**, all obligations of the Underwriter under this Policy shall be completely fulfilled and extinguished, and the Underwriter shall have no further obligations of any kind or nature whatsoever under this Policy.

(O) **Acceptance:**

The **Insureds** agree that this Policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the Underwriter or any of its agents relating to this insurance.

(P) **Headings:**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

**In witness whereof the Underwriter has caused this Policy to be executed on the Declarations Page.**

Secretary

President

ENDORSEMENT NO. 1
RHODE ISLAND AMENDATORY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

Policy No. 751-080581-97
Issued to Lifespan Corporation
Issued by Executive Risk Indemnity Inc.

In consideration of the premium charged:

(1) The Underwriter may cancel or non-renew this Policy only by mailing or delivering to the entity named in ITEM 1 of the Declarations, at least thirty (30) days before the Expiration Date set forth in ITEM 2(b) of the Declarations, a written notice stating when, not less than thirty (30) days thereafter, such cancellation or non-renewal will be effective and containing the specific reason or reasons for cancellation or non-renewal.

(2) The "Cancellation" section of this Policy is hereby modified to the following extent:

"If cancellation of this Policy is effected on behalf of the entity named in ITEM 1 of the Declarations by a premium finance company pursuant to the terms of a financing agreement containing a power of attorney, such earned premium shall be computed pro-rata and not in accordance with the short-rate table."

(3) Subject to all of the other provisions of this Policy, the entity named in ITEM 1 of the Declarations may exercise its right to purchase a Discovery Period within thirty (30) days after the end of the Policy Period.

(4) If any person or entity entitled to coverage under this Policy is a defendant in any civil action as to which this Policy provides coverage and the plaintiff in such action makes a written offer to the Underwriter to settle the action for an amount equal to or less than the then-available limit of liability applicable under this Policy to Loss from such Claim, then, if the Underwriter rejects such offer, the term "Loss" will include, and the Underwriter will be liable for, all interest due on any otherwise covered judgment against a person or entity entitled to coverage under this Policy entered by the court in such action, even if the amount of such interest would, when added to the amount of any other Loss previously paid under this Policy, exceed the then-available limit of liability applicable under this Policy to Loss from such Claim. A written offer, as described above, will be presumed to have been rejected if the Underwriter does not respond in writing within thirty (30) days.

(5) The Policy will be deemed to have been amended to the extent necessary to effect the purposes of this endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

**RIDER TO APPLICATION - RHODE ISLAND APPLICANTS ONLY**

PARAGRAPH (B) ON PAGE 3 IS REPLACED BY THE FOLLOWING:

(B) THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES SHALL BE REDUCED, AND MAY BE COMPLETELY EXHAUSTED, BY AMOUNTS INCURRED AS "DEFENSE EXPENSES" AND, IN THAT EVENT, THE UNDERWRITER IS NOT LIABLE FOR "LOSS" COSTS IN EXCESS OF THE LIMIT OF LIABILITY, AND THAT "DEFENSE EXPENSES" SHALL BE SUBJECT TO THE DEDUCTIBLE AMOUNT; AND

THE FOLLOWING PARAGRAPH IS ADDED:

(D) THE PARENT ORGANIZATION HAS THE RIGHT, UPON WRITTEN REQUEST TO THE UNDERWRITER, TO AN ACCOUNTING OF DEFENSE EXPENSES.

Acknowledged by ______________________________
Chairman and/or President Signature

ENDORSEMENT NO. 2
ACQUISITION ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged, Section II. Definitions (E) is amended to read as follows:

"(E) "Insured Entity" means the Parent Organization and any for-profit or non-profit Subsidiary as of the Inception Date, plus (1) any non-profit Subsidiary created or acquired during the Policy Period, (2) if The Underwriter agrees to provide such coverage under IV. Condition (G), any for-profit Subsidiary created or acquired during the Policy Period and (3)

Miriam Women's Association

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

ENDORSEMENT NO. 3
BODILY INJURY/PROPERTY DAMAGE EXCLUSION

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged, Section III. Exclusions (B) (1) is amended to read as follows:

"(1) based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person, or damage to or destruction of any tangible property including loss of use thereof;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

ENDORSEMENT NO. 4
NON PYRAMIDING ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged:

(1) If a Claim is made against any Insured Person for a Wrongful Act in connection with his or her service, in any capacity, with any entity other than the Parent Organization or a Subsidiary, and if that Claim gives rise to coverage both under this Policy and under another policy or policies of directors' and officers' liability or other similar insurance issued by Executive Risk Indemnity Inc to any entity other than the Parent Organization, ERII's maximum aggregate limit of liability under all such policies combined for all Loss, including Defense Expenses, in respect of that Claim shall not exceed the largest single available limit of liability under any of those policies, including this Policy, as in effect as of the time such Claim is deemed to have been made.

(2) If, under the circumstances described in paragraph (1) above, Loss resulting from a Claim is covered in part under this Policy and in part under one or more other policies issued by Executive Risk Indemnity Inc, the applicable retention or deductible set forth in the Declarations of each applicable policy shall be applied separately to that part of the Loss, if any, covered thereby, and the sum of the retentions or deductibles so applied shall constitute the retention or deductible applicable to all Loss resulting from such Claim.

(3) Nothing in this endorsement is intended, nor shall it be construed, to obligate or require the payment of Loss, including Defense Expenses, under this Policy in any amount exceeding the available Limit of Liability under this Policy.

(4) The Parent Organization agrees, on its own behalf and on behalf of all Insureds, that ERII may, at its sole discretion, require any controversy or dispute which may arise out of or relate to the application of this endorsement, including but not limited to any allocation of Loss between or among applicable policies, to be submitted to binding arbitration in accordance with the rules of the American Arbitration Association, and that judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereover.

All other terms, conditions and limitations of this Policy shall remain unchanged.

____________________________
Authorized Representative

## ENDORSEMENT NO. 5
## OUTSIDE DIRECTORS LIABILITY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged, the term "Wrongful Act" will also include any actual or alleged error, omission, misstatement, misleading statement or breach of duty by an Insured Person while serving at the express written direction of the Insured Entity in connection with one or more of the joint ventures or partnerships set forth below, if the Insured Entity then has an equity interest in such joint venture or partnership:

Name of Joint Venture or Partnership

North Main Imaging, Inc.

All other terms, conditions and limitations of this Policy shall remain unchanged.

______________________________
Authorized Representative

# ENDORSEMENT NO. 6
# RENEWAL CREDIT ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

Policy No. 751-080581-97
Issued to Lifespan Corporation
Issued by Executive Risk Indemnity Inc.

In consideration of the Parent Organization's commitment as described in paragraph (2) below and only if the conditions precedent set forth in paragraph (1)(b) below have been satisfied:

(1) The Underwriter will renew this Policy under the same terms, conditions, limitations and endorsements of this Policy (including the Limit of Liability, premium and retentions) as in effect immediately prior to the Expiration Date, except that:

(a) The Underwriter shall retain the sole option to determine whether this endorsement shall be attached to and form part of any renewal policy; and

(b) The Underwriter's obligation to renew this Policy as provided in this paragraph is subject to the satisfaction of the following conditions precedent:

(i) the premium for such renewal must be paid prior to the Expiration Date of this Policy;

(ii) no Insured shall have given notice to the Underwriter, under this Policy or under any policy of which this Policy is a renewal or replacement, of any Claim or of any circumstance which may subsequently give rise to a Claim as to which the Underwriter shall have paid Loss or established loss reserves;

(iii) during the Policy Period, the Parent Organization shall not have been acquired by or merged into another entity such that the Parent Organization was not the surviving entity; nor shall there have been any receiver, conservator or similar official appointed as to the Parent Organization; nor shall there have been a change of 50% or more of the membership of the Parent Organization's board of directors or trustees; and

(iv) there shall have been no material change in the Parent Organization's financial condition during the Policy Period.

(2) In consideration of the Underwriter's commitment as described in paragraph (1) above and by acceptance of this endorsement, the Parent Organization agrees:

(a) to accept a renewal of this Policy if the conditions precedent set forth in paragraph (1)(b) above have been satisfied; and

(b) to accept a renewal of this Policy under the terms and conditions set forth in paragraph (1) above if the Underwriter, in its sole discretion, offers such renewal even though the conditions precedent set forth in paragraph (1)(b) above have not been satisfied.

(3) Nothing in this endorsement is intended, nor shall it be construed, to prevent the Underwriter and the Parent Organization from agreeing to a renewal of this Policy under mutually agreeable terms, conditions, limitations and endorsements which may differ, in whole or in part, from those set forth in this endorsement.

(4) Upon any renewal of this Policy under the terms and conditions set forth in paragraph (1) above, the Parent Organization will receive a "renewal credit" in the form of a return of premium in an amount equal to fourteen and one-half percent (14.5%) of the premium paid for such renewal; provided, that the payment to the Parent Organization of such "renewal credit" shall be deemed not to reduce the amount of the premium for such renewal policy as set forth in Item 5 of its Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

______________________________
Authorized Representative

ENDORSEMENT NO. 7

SPOUSAL EXTENSION ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged:

(1) The coverage afforded under this Policy shall, subject to all of its terms, conditions, limitations and exclusions, be extended to apply to Loss resulting from a Claim made against a person who, at the time the Claim is made, is a lawful spouse of an Insured Person, but only if:

(a) the Claim against such spouse results from a Wrongful Act actually or allegedly committed by the Insured Person to whom the spouse is married; and

(b) such Insured Person and his or her spouse are represented by the same counsel in connection with such Claim.

(2) No spouse of an Insured Person shall, by reason of this endorsement, have any greater right to coverage under this Policy than the Insured Person to whom such spouse is married.

(3) The Underwriter shall not be liable under this endorsement to make any payment of Loss in connection with any Claim against the spouse of an Insured Person for any actual or alleged act, error, omission, misstatement, misleading statement, omission or breach of duty by such spouse.

All other terms, conditions and limitations of this Policy shall remain unchanged.

______________________________
Authorized Representative

ENDORSEMENT NO. 8

PRIOR AND PENDING LITIGATION ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

Policy No. 751-080581-97
Issued to Lifespan Corporation
Issued by Executive Risk Indemnity Inc.

In consideration of the premium charged, Section III. Exclusions (B)(4) is amended to read as follows:

"(4) based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance or situation (a) underlying or alleged in any prior or pending litigation as of November 2, 1987, with respect to Claims against any Insured Person, (b) underlying or alleged in any prior or pending litigation as of December 15, 1992, with respect to Claims against the Insured Entity, or (c) which has been the subject of any notice given before the Inception Date under any policy of insurance;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

ENDORSEMENT NO. 9
OUTSIDE DIRECTORS LIABILITY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

Policy No. 751-080581-97
Issued to Lifespan Corporation
Issued by Executive Risk Indemnity Inc.

(1) Section IV. Condition (G) is amended to read as follows:
(G) ADJUSTMENTS:

If after the Inception Date the Insured Entity acquires or assumes all or substantially all of the equity, assets or liabilities of, or merges with, any for-profit entity, or creates a for-profit Subsidiary, for 90 days after the effective date of such transaction the coverage granted by this Policy shall extend to Loss from Claims for Wrongful Acts occurring after the effective date of such transaction or event which arise out of or relate to the entity, assets or liabilities acquired, assumed, merged with or created. After the expiration of such 90-day period, there shall be no coverage under this Policy for any such Loss, unless (1) within such 90-day period, the Underwriter receives from the Insured Entity full details of such transaction or event and (2) The Underwriter, at its sole discretion, agrees by written endorsement to provide such coverage upon such terms, conditions and limitations as it may require.

(2) If after the Inception Date the Insured Entity first acquires an equity interest in any joint venture, for 90 days after the effective date of such acquisition the coverage granted by this Policy shall extend to Loss from Claims for any actual or alleged error, omission, misstatement, misleading statement or breach of duty by an Insured Person serving at the express written direction of the Insured Entity as a director, officer, trustee, regent or governor of such joint venture. After the expiration of such 90-day period, there shall be no coverage under this Policy for any such Loss, unless (1) within such 90-day period, the Underwriter receives from the Insured Entity full details with respect to such joint venture and (2) The Underwriter, at its sole discretion, agrees by written endorsement to provide such coverage upon such terms, conditions and limitations as it may require.

(3) Section II. Definition (K) is amended to read as follows:

(K) "Wrongful Act" means any actual or alleged error, omission, misstatement, misleading statement or breach of duty:

(1) by an Insured Person solely in his or her capacity as such; or

(2) by an Insured Person while serving at the express written direction of the Insured Entity as a director or trustee of any other non-profit entity; or

(3) by an Insured Person while serving at the express written direction of the Insured Entity as a director, officer, trustee, regent or governor of any joint venture in which the Insured Entity had an equity interest on or before December 15, 1992; or

(4) with respect to coverage under Insuring Agreement C, by the Insured Entity.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

ENDORSEMENT NO. 10
INSURANCE COMPANY ERRORS AND OMISSIONS ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged:

1. Whenever used in this Policy, **"Insurance Contract"** means any policy of insurance, reinsurance or bond or indemnity, including but not limited to annuities, endowments, pension contracts and risk management self-insurance programs, pools or similar programs.

2. The Underwriter shall not pay **Loss**, including **Defense Expenses**, for **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the ownership, control or operations of Rhode Island Hospital Physician Organization, Miriam PHO, RI Risk Management Foundation and R.I.S.E., including without limitation any of the following activities by or on behalf of Rhode Island Hospital Physician Organization, Miriam PHO, RI Risk Management Foundation and R.I.S.E.:

   (a) the actual or alleged refusal to renew or the cancellation of any **Insurance Contract**, or

   (b) any actual or alleged failure or refusal to pay, or delay in the payment of benefits due or alleged to have been due, under any **Insurance Contract**, or

   (c) any actual or alleged lack of good faith or unfair dealing in the handling of any claim or obligation under any **Insurance Contract**, or the brokering or underwriting of insurance policies or risks, or

   (d) the actual or alleged conduct of any **Insured** as insurance agent or insurance broker in the negotiation, placement or maintenance of any **Insurance Contract**, or

   (e) the failure to effect or maintain reinsurance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

____________________________
Authorized Representative

ENDORSEMENT NO. 11
PRIOR ACTS ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

Policy No. 751-080581-97
Issued to Lifespan Corporation
Issued by Executive Risk Indemnity Inc.

In consideration of the premium charged:

(1) Subject to paragraph (2) of this endorsement, Section III. Exclusion (B)(6) shall not apply to Claims against any Subsidiary listed below or its Insured Persons:

Newport Healthcare Corp.

(2) The Underwriter's maximum aggregate limit of liability under this Policy for all Loss, including Defense Expenses for all Claims made during the Policy Period to which Section III. Exclusion (B)(6) would have applied but for paragraph (1) above shall be $5,000,000.00, which amount shall be part of and not in addition to the maximum aggregate Limit of Liability set forth in Item 3 of the Declarations. Payment by the Underwriter of any Loss, including Defense Expenses, in respect of such Claims, subject to the $5,000,000.00, sub-limit set forth above, shall also reduce the maximum aggregate Limit of Liability set forth in Item 3 of the Declarations applicable to all Claims under the Policy.

(3) The Underwriter shall not pay Loss, including Defense Expenses, for Claims against any Subsidiary listed in paragraph (1) above or its Insured Persons based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance or situation underlying or alleged in any prior and/or pending litigation as of January 17, 1988.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

ENDORSEMENT NO. 12
PRIOR AND PENDING LITIGATION EXCLUSION

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged, Section III. Exclusions (B) (4) is amended to read as follows:

"(4) based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance or situation:

(a) underlying or alleged in any prior or pending litigation as of November 2, 1987, with respect to Claims against the Insured Persons of Rhode Island Hospital or Miriam Corporation (of September 11, 1988)

(b) underlying or alleged in any prior or pending litigation as of December 15, 1992, with respect to Claims against the Insured Entity, Miriam Corporation.

(c) underlying or alleged in any prior or pending litigation as of August 9, 1994, with respect to all other Claims, or

(d) which has been the subject of any notice given before the Inception Date under any policy of insurance."

All other terms, conditions and limitations of this Policy shall remain unchanged.

____________________________
Authorized Representative

**ENDORSEMENT NO. 13**
**PRIOR ACTS EXCLUSION**

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

Policy No. 751-080581-97
Issued to Lifespan Corporation
Issued by Executive Risk Indemnity Inc.

In consideration of the premium charged, the definition of "Insured Entity" shall be deemed to include any entity which was, but ceased to be, a Subsidiary prior to the Inception Date; provided, however, that the Underwriter shall not pay Loss, including Defense Expenses, for Claims against any such entity or its Insured Persons in such capacities based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act occurring during any time in which such entity was not a Subsidiary.

All other terms, conditions and limitations of this Policy shall remain unchanged.

______________________________
Authorized Representative

ENDORSEMENT NO. 14
EMPLOYMENT PRACTICES LIABILITY (ENTITY) ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged:

(1) Solely with respect to Claims against the Insured Entity:

(a) except for Claims for Employment Practices Wrongful Acts, the Underwriter shall not pay Loss, including Defense Expenses, for Claims for any actual or alleged liability under any contract or agreement, except for liability which would have attached even in the absence of such contract or agreement; and

(b) except for Defense Expenses, the Underwriter shall not pay Loss resulting from any portion of a Claim seeking relief or redress in any form other than money damages.

(2) The term "Loss" shall not include any salary, wages or other employment-related benefits which the Insured Entity is liable to pay any employee:

(a) under a written contract either to commence or continue employment or to make any payment in the event of a termination of employment; or

(b) by operation of the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, any workers' compensation, unemployment insurance, social security, or disability benefits law, other similar provisions of any federal, state or local statutory or common law or any rules or regulations promulgated under any of the foregoing.

(3) The term "Wrongful Act" shall also include an Employment Practices Wrongful Act by an Insured.

(4) "Employment Practices Wrongful Act" will mean any actual or alleged:

(a) wrongful termination, whether actual or constructive, of the employment of, or demotion of, or failure or refusal to hire or promote, any person;

(b) employment discrimination, including any failure or refusal to hire any person, or discharge of or other discrimination against any person with respect to his or her compensation or any of the terms, conditions or privileges of his or her employment, or any limitation, segregation or classification of employees or applicants for employment in any way which would deprive or tend to deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee, because of such person's race, color, religion, age, sex, national origin, disability, pregnancy or other protected status;

(c) sexual harassment, including unwelcome sexual advances, requests for sexual favor or other verbal or physical conduct of a sexual nature that are made a condition of employment, are used as a basis for employment decisions, or create a work environment that interferes with performance; or

(d) retaliatory treatment against an employee of the Insured Entity on account of such employee's exercise or attempted exercise of his or her rights under law.

(5) Section III. Exclusion (B)(1), as amended, shall not apply to Loss, including Defense Expenses, resulting from allegations of mental anguish or emotional distress to the extent that such allegations are made as part of a Claim:

(a) for an Employment Practices Wrongful Act; and/or

(b) for Peer Review Practices.

For the purposes of this endorsement, the term "Peer Review Practices" means the process of evaluating, by members of a formal, duly constituted professional review board or committee, any individual or entity for the purpose of selecting, employing, contracting with or credentialing providers of medical services.

All other terms, conditions and limitations of this Policy shall remain unchanged.

____________________________________
Authorized Representative

ENDORSEMENT NO. 15
AMEND DEFINITION OF "LOSS" TO INCLUDE
PUNITIVE DAMAGES (WITH SUBLIMIT)

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged:

(1) With respect only to Claims against the Insured Persons under Section I Insuring Agreements (A) and (B), the definition of "Loss" set forth in Section II Definitions is amended to include punitive or exemplary damages, where insurable by law, in an amount not exceeding the sum of $2,500,000.00, which amount is included within, and not in addition to, the Underwriter's maximum aggregate Limit of Liability set forth in ITEM 3 of the Declarations.

(2) With respect to Claims against the Insured Entity under Section I Insuring Agreement (C), if applicable, the definition of "Loss" set forth in Section II Definitions shall remain unchanged.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

## ENDORSEMENT NO. 16
## AMEND DEFINITION OF INSURED ENTITY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged:

(1) Subject to the limitations set forth in paragraphs (2) and (3) below, each of the joint ventures set forth below shall be deemed to be included within the term "Insured Entity," but only during such time or times as the Parent Organization has an equity interest therein:

Rhode Island PHO and Miriam PHO, Inc.

(2) There shall be no coverage under Section I. Insuring Agreement (C) in respect of any Claim against any entity identified in paragraph (1) of this endorsement.

(3) The Underwriter's maximum aggregate limit of liability for all Loss, including Defense Expenses, for all Claims made during the Policy Period against the Insured Persons of any of the entities identified in paragraph (1) of this endorsement shall be $10,000,000.00, which amount shall be part of and not in addition to the $25,000,000.00 maximum aggregate Limit of Liability set forth in ITEM 3 of the Declarations applicable to all Claims made during the Policy Period. Payment by the Underwriter of Defense Expenses in respect of Claims against the Insured Persons of any of the entities identified in paragraph (1) of this endorsement shall reduce the $10,000,000.00 sub-limit of liability applicable to such Claims.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

## ENDORSEMENT NO. 17
## BROAD NUCLEAR EXCLUSION

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged no coverage will be available under this Policy for Loss, including Defense Expenses, for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged nuclear reaction, nuclear radiation, radioactive contamination, or radioactive substance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

ENDORSEMENT NO. 18

AMEND DEFINITION OF "LOSS" TO COVER EXCESS BENEFIT TRANSACTION EXCISE TAX

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged:

(1) For the purposes of this endorsement:

(a) "Excess Benefit Transaction Excise Tax" means any excise tax imposed by the Internal Revenue Service on an Insured Person who is an Organization Manager (as defined below) as a result of such Insured Person's participation in an Excess Benefit Transaction (as defined below);

(b) "Organization Manager" means an "organization manager" as that term is defined in Section 1311 of the Taxpayer Bill of Rights 2, P.L. 104-168 (the "Act");

(c) "Excess Benefit Transaction" means an "excess benefit transaction" as that term is defined in the Act; and

(d) "Disqualified Person" means a "disqualified person" as that term is defined in the Act.

(2) Subject to paragraph (3) below and only where insurable by law, the definition of "Loss" set forth in Section II Definitions of the Policy is amended to include any Excess Benefit Transaction Excise Tax in an amount not exceeding $10,000.

(3) The coverage afforded by paragraph (2) above shall apply only if and to the extent that indemnification by the Insured Entity for Excess Benefit Transaction Excise Taxes is not expressly prohibited in the bylaws, certificate of incorporation or other organizational documents of the Insured Entity.

(4) No coverage will be available under this Policy for any excise tax imposed by the Internal Revenue Service on any Disqualified Person for any Excess Benefit Transaction.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

ENDORSEMENT NO. 19
PREMIUM CREDIT RENEWAL ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 1, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

As a result of the Underwriter's favorable loss experience with Lifespan Corporation, and in full satisfaction of the Underwriter's obligations under its agreement with Lifespan Corporation dated November 7, 1994, the Underwriter hereby provides a return premium of $24,731.00, for the Parent Organization's 1997-1998 policy premium.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Paul L. Romano

Authorized Representative

ENDORSEMENT NO. 20
DELETE AN ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 31, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged, Endorsement No. 2 (D21178,2/94) is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

John P Kearney

Authorized Representative

ENDORSEMENT NO. 21
ACQUISITION ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 31, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged, Section II. Definitions (E) is amended to read as follows:

"(E) "Insured Entity" means the Parent Organization and any for-profit or non-profit Subsidiary as of the Inception Date, plus (1) any non-profit Subsidiary created or acquired during the Policy Period, (2) if The Underwriter agrees to provide such coverage under IV. Condition (G), any for-profit Subsidiary created or acquired during the Policy Period and (3) Miriam Women's Association; (4) Health Strategies Group, Inc.; (5) Liability Limited, Inc.; (6) New England Medical Center Insurance Company of Vermont, Inc.; (7) New England Medical Center Insurance Company

All other terms, conditions and limitations of this Policy shall remain unchanged.

John P Kearney

Authorized Representative

ENDORSEMENT NO. 22
DELETE AN ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 31, 1998, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged, Endorsement No. 21 (D21178,2/94) is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

John P Kearney

Authorized Representative

ENDORSEMENT NO. 23
ACQUISITION ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 31, 1998, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged, Section II. Definitions (E) is amended to read as follows:

"(E) "Insured Entity" means the Parent Organization and any for-profit or non-profit Subsidiary as of the Inception Date, plus (1) any non-profit Subsidiary created or acquired during the Policy Period, (2) if The Underwriter agrees to provide such coverage under IV. Condition (G), any for-profit Subsidiary created or acquired during the Policy Period and (3) Health Strategies Group, Inc.; (4) Limited Liability, Inc.; (5) New England Long-Term Care, Inc.; (6) New England Medical Center Insurance Company of Vermont, Inc.; (7) New England Medical Center Insurance Company

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

ENDORSEMENT NO. 24
DELETE AN ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 31, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged, Endorsement No. 23 (D21178,2/94) is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

John P Kearney

Authorized Representative

ENDORSEMENT NO. 25
ACQUISITION ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on October 31, 1997, forms part of

| | |
|---|---|
| Policy No. | 751-080581-97 |
| Issued to | Lifespan Corporation |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged, Section II. Definitions (E) is amended to read as follows:

"(E) "Insured Entity" means the Parent Organization and any for-profit or non-profit Subsidiary as of the Inception Date, plus (1) any non-profit Subsidiary created or acquired during the Policy Period, (2) if The Underwriter agrees to provide such coverage under IV. Condition (G), any for-profit Subsidiary created or acquired during the Policy Period and (3) Health Strategies Group, Inc.; (4) Limited Liability, Inc.; (5) New England Long-Term Care, Inc.; (6) New England Medical Center Insurance Company of Vermont, Inc.; (7) New England Medical Center Insurance Company; (8) Miriam Women's Association

All other terms, conditions and limitations of this Policy shall remain unchanged.

John P Kearney

Authorized Representative

**RI Risk Management Foundation, Inc.**
*A Lifespan Partner*

The CORO Building, Suite 170
167 Point Street
Providence, RI 02903
Tel 401 444-8273
Fax 401 444-8963

VIA CERTIFIED MAIL; RETURN RECEIPT REQUESTED

RECEIVED
AUG 17 1998
ERMA
CLAIMS DEPT.

August 10, 1998

Executive Risk Indemnity, Inc.
ATTENTION: VICE PRESIDENT OF CLAIMS
Executive Risk Management Associates
P.O. 2002
Simsbury, CT 06070

Re: Policy Number: 751-052157-96
Policy Period: 10/1/97-10/1/98

Dear Sir/Madam:

On behalf of Lifespan Corporation and its affiliates, including Rhode Island Hospital, and pursuant to the notice provisions of the aforementioned policy, I wish to notify you of a potential claim under the civil False Claims Act. On March 23, 1998, Rhode Island Hospital was served with a subpoena for certain medical records of patients admitted with pneumonia and for records relating to billing and coding of pneumonia admissions.

Please let me know if I can provide you with any additional information.

Sincerely,

Roland C. Loranger

Roland C. Loranger
President

RCL:vt

c: Sidney M. Bailey
Richard Ward, Esq.

**ARISING SLIP**

16962

INSURED: Lifespan Corp.
POLICY NO.: ~~[illegible]~~ 080581 | POLICY YEAR: 10/1/97-98
JOB/PROGRAM: RF
ACKNOWLEDGE TO: Roland C. Loranger
ACKNOWLEDGE CC TO: Broker
SUBJECT: Subpoena
CLAIMANT: Unknown
ARISING DATE: 8-10-98 | NOTICE DATE: 8-17-98
CORRESPONDENCE DATE: 8-10-98 | ASSIGN TO: Eileen Stein.
COMMENT: We need the subpoena.
If this matter develops, we should transfer it to Annamarie.

 "C"

**RI Risk Management Foundation, Inc.**
*A Lifespan Partner*

The CORO Building, Suite 170
167 Point Street
Providence, RI 02903
Tel 401 444-8273
Fax 401 444-8963

RECEIVED
SEP 10 1998
Claim...

VIA FAX & U.S. MAIL

September 3, 1998

Eileen G. Stein
Claims Analyst
Executive Risk Management Associates
P.O. Box 2002
Simsbury, CT 06070-7683

| | | |
|---|---|---|
| Re: | Insured: | Insured Person(s) of Lifespan Corporation |
| | Policy No.: | 080581 |
| | Reference No.: | 00 16962 |
| | Subject: | Subpoena |

Dear Ms. Stein:

I have enclosed a copy of the subpoena you requested recently regarding the above matter.

Sincerely,

Roland C. Loranger
President

RCL:vt
Enclosure

# UNITED STATES OF AMERICA

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### OFFICE OF INSPECTOR GENERAL

## SUBPOENA DUCES TECUM

TO

Custodian of Records
Rhode Island Hospital
593 Eddy Street
Providence, Rhode Island 02903

*YOU ARE HEREBY COMMANDED TO APPEAR BEFORE* Special Agent Christine Sparks *an official of the Office of Inspector General, at* Room 2475, John F. Kennedy Federal Building, Government Center *in the City of* Boston *and State of* Massachusetts *on the* 22nd *day of* April, *19* 98 *at* 9 *o'clock* a *m of that day in connection with* an investigation of possible false or otherwise improper claims for payment under Title XVIII (Medicare) of the Social Security Act.

*and you are hereby required to bring with you and produce at said time and place the following:*

See Attachment A

*which are necessary in the performance of the responsibility of the Inspector General under Public Law 95-452 [5 USC App. 3 Section 6(a)(4)], as amended by Public Law 100-504, to conduct and supervise audits and investigations and to promote economy, efficiency and effectiveness in the administration of and to prevent and detect fraud and abuse in the programs and operations of the Department of Health and Human Services.*

DEPARTMENT OF HEALTH & HUMAN SERVICES · USA

*IN TESTIMONY WHEREOF* Charles A. Bateman, Regional Inspector General for Investigations *the undersigned official of the Office of Inspector General of said DEPARTMENT OF HEALTH AND HUMAN SERVICES, has hereunto set* his *hand this* 23RD *day of* March *19* 98

[signature]

## RETURN OF SERVICE

*I, being a person over 18 years of age, hereby certify that a copy of this subpoena was duly served on the person named herein by means of—*

*1. personal delivery to an individual, to wit:*

______________________
(Name)

______________________
(Title)

______________________
(Address)

*2. personal delivery to an address, to wit:*

______________________
(Description of premises)

______________________
(Address)

______________________

*3. registered or certified mailing to:*

______________________
(Name)

______________________
(Address)

______________________

at ____ { } a.m. / p.m. on ____________, 19____.

______________________
(Signature)

______________________
(Title)

UNITED STATES OF AMERICA
DEPARTMENT OF HEALTH AND
HUMAN SERVICES
OFFICE OF INSPECTOR GENERAL

## SUBPOENA DUCES TECUM

*Upon contumacy or refusal to obey, this subpoena shall be enforceable by order of the appropriate United States District Court.*

OIG-1 (4/89)

Attachment A

1) For each hospitalization identified by date of discharge on Attachment B, the patient's medical record or file including but not be limited to: the patient's admission report; discharge summary; physician notes and orders; lab reports; culture reports; and any other documents used by the hospital billing department to determine the appropriate diagnostic and DRG (diagnosis related group) billing codes.

2) For each hospitalization identified by date of discharge on Attachment B, all documents relating to the billing and coding of any claims submitted to the Medicare program.

3) For the period January 1991 to the present, all organizational charts for the billing department or office and all listings or other documents containing job descriptions or detailing the responsibilities for each employee who had billing and/or coding responsibilities.

4) For the period January 1991 to the present, any reports, manuals, guidelines, notes, training materials, minutes of meetings, analyses, audits, policies, contracts with consultants, correspondence or other documents relating in whole or in part to the hospital's billing and/or coding of Medicare claims for the treatment of patients with pneumonia.

5) For the period January 1991 to the present, any documents identifying any computer programs used by the hospital for billing under the DRG system, including DRG optimizer programs, DRG grouping programs and DRG checker programs, relating to the billing and coding of pneumonia.

03/24/98 TUE 11:51 FAX 401 444 6206 GENERAL COUNSEL
3-23-1998 11:32PM FROM P. 6

# ATTACHMENT B

| [redacted] | |
|---|---|
| | |
| 035147398A | 01/31/95 |
| 035165509B | 02/16/95 |
| 035241498A | 03/23/95 |
| 035284446A | 12/31/94 |
| 036098902A | 06/08/95 |
| 037327843A | 07/17/95 |
| 037461241A | 02/18/95 |
| 039035566A | 01/05/95 |
| 248608767A | 01/05/95 |
| 014017609A | 02/02/94 |
| 035014370A | 07/11/94 |
| 036128816A | 07/24/94 |
| 035148835A | 03/18/94 |
| 036161381A | 03/11/94 |
| 037017943A | 01/21/94 |
| 037077094B | 06/22/94 |
| 037090450B | 05/20/94 |
| 037128804A | 12/09/93 |
| 037140940A | 09/13/94 |
| 037187711A | 07/11/94 |
| 037443049A | 02/19/94 |
| 153169827B | 07/31/94 |
| 309121965A | 04/01/94 |
| 017106690A | 04/30/93 |
| 019076548A | 10/06/92 |
| 036019646B | 10/31/92 |
| 036094692A | 06/16/93 |
| | |

**RI Risk Management Foundation, Inc.**
*A Lifespan Partner*

The CORO Building, Suite 170
167 Point Street
Providence, RI 02903
Tel 401 444-8273
Fax 401 444-8963

# FACSIMILE COVER SHEET

**DATE:** 9/3/98

**NUMBER OF PAGES INCLUDING COVER:** 6

If all pages are not received, please contact Valerie Till at 401-444-4595.

**TO:**

Eileen G. Stein
Claims Analyst
Executive Risk Management Associates
860-408-2002

**FROM:** Roland C. Loranger

**COMMENTS:**

| | |
|---|---|
| Re: Insured: | Insured Person(s) of Lifespan Corporation |
| Policy No.: | 080581 |
| Reference No.: | 00 16962 |
| Subject: | Subpoena |

Please see attached correspondence.

The original of the transmitted document will be sent by:
( ) Interoffice
( X ) Ordinary Mail
( ) Messenger
( ) Overnight Mail
( ) This will be the only form of delivery of the transmitted document

This facsimile transmission and any accompanying documents contain information intended only for the confidential use of the individual(s) named above. If you are not the named recipient or an agent for the named recipient, any disclosure, copying, or distribution of the information contained in this facsimile transmission is prohibited. If you have received this transmission in error, please call us to arrange for the return of the documents at our expense.

Executive Risk

August 17, 1998

VIA FAX & U.S. MAIL

Roland C. Loranger
R.I. RISK MANAGEMENT FOUNDATION, INC.
The CORO Building, Suite 170
167 Point Street
Providence, RI 02903

| RE: | INSURED: | Insured Person(s) of Lifespan Corporation |
|---|---|---|
| | POLICY NO: | 080581 |
| | REFERENCE NO: | 00 16962 |
| | SUBJECT: | Subpoena |

Dear Mr. Loranger:

Executive Risk Management Associates is the Claims Manager for the Executive Risk Indemnity Inc. ("ERII") in connection with the above captioned matter. On behalf of ERII we acknowledge your correspondence dated August 10, 1998, together with its enclosures.

This matter has been assigned to Eileen G. Stein, Claims Analyst, under the above reference number. We ask that you include our reference number on all related future correspondence.

We will soon provide you with our initial analysis of the potential applicability, if any, of the above-referenced Policy to the matter raised in your correspondence.

In the interim, on behalf of ERII we reserve all rights and defenses to which it may be entitled under the Policy or applicable law.

Very truly yours,

Christine Trinh

Christine Trinh
Administrative Assistant
Direct Dial (860) 408-2392
Fax (860) 408-2381
E-Mail lindstre@execrisk.com

cc: Laura Clark
ENCON A DIVISION OF VICTOR O SCHINN
Two Wisconsin Circle
Suite 1200
Chevy Chase, MD 20815-7022

D O

Executive Risk

September 24, 1998

Roland C. Loranger
R.I. Risk Management Foundation, Inc.
The CORO Building, Suite 170
167 Point Street
Providence, RI 02903

| | | |
|---|---|---|
| RE: | INSURED: | Insured Person(s) of Lifespan Corporation |
| | POLICY NO: | 080581 |
| | REFERENCE NO: | 00 16962 |
| | SUBJECT: | Subpoena |

Dear Mr. Loranger:

As you know, Executive Risk Management Associates ("Executive Risk") is the Claims Manager for Executive Risk Indemnity Inc. ("ERII") in connection with the Directors and Officers Liability Insurance Including Healthcare Organization Reimbursement Policy issued to Lifespan Corporation ("Lifespan") for the policy period October 1, 1997 through October 1, 1998 ("the Policy").

The above-cited Policy provides coverage, subject to all Policy terms and conditions, to Lifespan and its Insured Persons. Section II(C) of the Policy defines "Claim". "Claim" means any adjudicatory proceeding in a court of law or equity brought against any of the Insured Persons which seeks actual monetary damages or other relief and which may result in a Loss under this Policy. Since no Claim has been made, there is presently no coverage under the insuring agreements.

However, should circumstances of facts subsequently develop so as to constitute a Claim, please provide notice to me as soon as practicable. Meanwhile, we will treat this matter as notice of a fact, circumstance or event which may lead to a Claim.

Please understand our attention to this matter is without prejudice to the interest of any party.

D O



Very truly yours,

Eileen G. Stein
Claims Analyst
Direct Dial (860) 408-2586
Fax (860) 408-2381
E-mail steine@execrisk.com

cc: Laura Clark
ENCON A DIVISION OF VICTOR O SCHINN
Two Wisconsin Circle
Suite 1200
Chevy Chase, MD 20815-7022

"F"

AO 440 (Rev. 10/93) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of Rhode Island

United States of America
ex rel. Health Outcomes Technologies,

Plaintiff

V.

Rhode Island Hospital

Defendant

**SUMMONS IN A CIVIL CASE**

CASE 01-243-ML

TO: (Name and address of Defendant)

Rhode Island Hospital
593 Eddy Street
Providence, RI 02903
Roland C. Loranger, registered agent for service of process

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Michael F. Hertz
Joyce R. Branda
Keith E. Dobbins
United States Department of Justice
Civil Division
Commercial Litigation Branch
Post Office Box 261
Ben Franklin Station
Washington, DC 20044

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

CLERK Francis P. McCabe

DATE 11/20/02

(By) DEPUTY CLERK

AO 440 (Rev. 10/93) Summons in a Civil Action

## RETURN OF SERVICE

| Service of the Summons and complaint was made by me[1] | DATE |
|---|---|
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the third-party defendant. Place where ______________________

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: ______________________

☐ Returned ______________________

☐ Other (specify): ______________________

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on ______________________ ______________________

Date *Signature of Server*

______________________

*Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RECEIVED
OCT 22 2002
U.S. District Court
District of Rhode Island

UNITED STATES OF AMERICA, :
ex rel. HEALTH OUTCOMES :
TECHNOLOGIES, :
:
Plaintiff, :
:
v. : CIVIL ACTION NO. 01-243-ML
:
RHODE ISLAND HOSPITAL :
:
Defendant. :

RECEIVED
NOV 20 2002
U.S. District Court
District of Rhode Island

ORDER

On October 21, 2002, the United States filed a notice intervening in this action pursuant to the False Claims Act, 31 U.S.C. §§ 3730(b)(2) and (4). Upon due consideration of the notice and the papers on file in this action,

IT IS HEREBY ORDERED that,

1. the relator's complaint, the government's Notice of Intervention, and this Order be unsealed;

2. the United States serve its Complaint upon Defendant, together with this Order, within sixty (60) days;

3. all other papers or Orders on file in this matter, including any papers or Orders sealed by a previous District Court shall remain under seal; and

4. the seal shall be lifted on all matters occurring in this action after the date of this Order.

.d/

**SO ORDERED**

Mary M. Lisi

Mary M. Lisi
United States District Court Judge

**ENTER:**

**CLERK**

**DATE:** 10/23/02

CERTIFICATE OF SERVICE

It is hereby certified that on this date a copy of the foregoing was sent by United States mail, postage prepaid, to the following counsel for Relator:

Michael J. Holston, Esquire
Drinker, Biddle & Reath
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996

Date: 10/18/02

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA, ex rel. HEALTH OUTCOMES TECHNOLOGIES,

Plaintiff,

v.

RHODE ISLAND HOSPITAL

Defendant.

: CIVIL ACTION NO. 01-243-ML

RECEIVED
NOV 20 2002
U.S. District Court
District of Rhode Island

## COMPLAINT

The United States of America states as follows:

### Introduction

1. This is an action brought by the United States of America against Rhode Island Hospital for triple damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, and, in the alternative, for damages for unjust enrichment, payment by mistake, and recoupment.

2. In sum, this Complaint alleges that Rhode Island Hospital knowingly submitted claims to Medicare that were improper and inaccurate because they misstated the patient's diagnosis, and that, by submitting those improper claims, Rhode Island Hospital received more money from Medicare than it should have.

### Jurisdiction and Venue

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1345, 28 U.S.C. § 1331, and 31 U.S.C. § 3732(a).

4. Venue in this Court is proper under 28 U.S.C. § 1391 (b) & (c) and 31 U.S.C. § 3732(a).

## The Parties

5. The Plaintiff is the United States of America, on behalf of the United States Department of Health and Human Services ("HHS").

6. Relator Health Outcomes Technologies is a Pennsylvania corporation with its principal place of business at 350 South Main Street, Suite 109, Doylestown, Pennsylvania 18901.

7. Defendant Rhode Island Hospital ("RIH") is a Rhode Island corporation that owns and operates a hospital in Providence, Rhode Island. RIH's agent for service of process is Roland C. Loranger at 593 Eddy Street, Providence, RI 02903.

8. Medicare is a federally funded program that helps people over age 65 and disabled people pay their medical bills. One part of Medicare, known as "Part A", pays hospitals for their treatment of eligible Medicare beneficiaries.

9. The United States, through HHS, and its agency, the Centers for Medicare and Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration ("HCFA")), runs the Medicare program, including Part A. At all relevant times, the United States administered the Medicare Part A Program in Rhode Island through a contract with a private insurance company, called a Fiscal Intermediary. The Fiscal Intermediary for RIH was Blue Cross and Blue Shield of Rhode Island ("BCBS"). Under the contract, BCBS reviews, approves, and pays Medicare bills called "claims" received from hospitals that treat Medicare patients. Those claims are paid with federal funds. BCBS's offices are located at 444 Westminster St., Providence, Rhode Island 02903-3279.

10. RIH is a Medicare provider. RIH has an agreement with Medicare that it may treat Medicare patients, and bill Medicare for that treatment, but only if it bills Medicare according to Medicare rules.

**Medicare Inpatient Billing**

11. When RIH billed Medicare for an inpatient, that is, someone who stayed over a day in the hospital, it would send a claim to BCBS asking to be paid by Medicare.

12. The amount Medicare pays a hospital for treating a Medicare inpatient is based in large part on the illness or condition that led to the patient's admission to the hospital or was the patient's illness or condition that was principally treated by the hospital. Medicare calls this the "principal diagnosis." Medicare also looks at whether the patient had other problems that were treated at the hospital. Those other problems are called "complications and comorbidities" and are represented by a "secondary diagnosis."

13. When hospitals, including RIH, submit claims for treating Medicare inpatients, they assign code numbers representing the diagnoses for that patient. Those code numbers come from a book called the "International Classification of Diseases, 9th Edition," and are referred to as "ICD-9" codes.

14. It is important that the code numbers chosen by the hospital be accurate, because those numbers will determine how much money the hospital will be paid by Medicare for treating the patient covered by that claim. Further, because the patient's medical records are not submitted with the claim, the Fiscal Intermediary and CMS rely on the accuracy of the hospital's selection of the correct code. The hospital is responsible for making sure that the claims it submits to Medicare are correct.

15. CMS has established a scale of payments to hospitals called "diagnostic related groups" ("DRGs"). When a Medicare claim is submitted, the Fiscal Intermediary assigns the ICD-9 codes listed by the hospital to the related DRG. In other words, each ICD-9 code usually "groups" to a particular DRG. That DRG determines how much the hospital is paid. For example, most claims for pneumonia patients (and most pneumonia ICD-9 codes) result in assignment of DRG 89. Other pneumonia cases (and other ICD-9 codes), for which treatment is more resource intensive, result in assignment of DRG 79, which pays more money to the hospital than DRG 89.

16. The most important factor in determining what DRG is assigned to a claim is the ICD-9 code chosen by the hospital as the principal diagnosis. Therefore, a hospital may increase the money it gets from Medicare by improperly putting the wrong code on a claim for the principal diagnosis.

17. Hospitals, including RIH, are required to choose ICD-9 codes based on the diagnostic statements of a patient's treating physician in that patient's medical record. See 42 C.F.R. § 482.24 (c); Coding Clinic, Second Quarter 1990 at 14.

**Billing and Pneumonia Patients**

18. The ICD-9 codes include several different codes for pneumonia. The code that applies depends on the cause of the pneumonia. For example, ICD-9 Code 486 applies where the patient has pneumonia, but the cause of the pneumonia is not specified by the physician. ICD-9 Code 482.3 applies when the physician has documented that the cause of the pneumonia is streptococcus bacteria. ICD-9 Code 482.89 applies when the physician has documented a

specific bacteria that caused the pneumonia, but that bacteria is not listed in any of the other pneumonia codes.

19. Most of the ICD-9 codes listed for pneumonia cases, when listed on Medicare claims as the principal diagnosis, normally result in payments to a hospital under DRG 89. However, a few of them, including ICD-9 Code 482.89, normally result in a hospital's receiving a higher payment under DRG 79.

20. Since the specific etiological agent causing a patient's pneumonia is frequently not identified at all and the most common causes of pneumonia are listed elsewhere, ICD-9 Code 482.89, which stands for cases where the physician has identified the specific bacteria causing the pneumonia but that bacteria is not listed in the codes, is rarely used by hospitals. From the time that ICD-9 Code 482.89 was created in October 1992 through 1996, most hospitals in the United States assigned ICD-9 Code 482.89 to approximately 2 to 3% of their pneumonia cases.

21. Unlike the typical hospital however, from Fis[redacted]ear [redacted] Medicare pneumonia cases respectively, including many cases where the physician did not identify a specific bacteria as the cause of the patient's illness, contrary to the definition of ICD-9 Code 482.89. Following widespread news of a government investigation of the use of ICD-9 Code 482.89 in 1997, RIH's use of the code dropped to less than two percent of all pneumonia cases.

## Improper Conduct

22. [redacted]ough

the Fiscal Intermediary, BCBS) knowing that these billings were false, acting in reckless disregard for the truth, or with deliberate ignorance of their truth or falsity, by improperly assigning ICD-9 Code 482.89 to Medicare claims for its pneumonia patients. This damaged the United States by causing it to pay more to RIH than the amount to which RIH was actually entitled.

23. It was a part of this pattern and practice to submit claims to Medicare that listed ICD-9 Code 482.89 as the patient's principal diagnosis where no specific bacteria had been determined by the physician to be the cause of the patient's pneumonia.

24. It was further a part of this pattern and practice to submit claims to Medicare that listed ICD-9 Code 482.89 as the patient's principal diagnosis when there was no such diagnosis made by the treating physician, as reflected in the patient's medical record.

25. RIH submitted these claims despite the fact that it knew that it was improper to use ICD-9 Code 482.89 when the medical record lacked sufficient physician documentation of the cause of the patient's condition.

26. Further, [redacted].

27. Beginning in 1993, RIH employed an outside consultant to review and "optimize" RIH's use of ICD-9 codes generally with the goal of increasing RIH's Medicare reimbursement by consistently using codes that grouped to higher paying DRGs. Under the contract, the consultant was reimbursed 25% to 30% of any specific coding increases that it proposed. If the consultant

suggested decreases in coding, it was not reimbursed at all for the suggestion. [redacted]re.

28. Under the Medicare payment system, each DRG is assigned a relative weight that measures the resources the diagnosed condition or procedure typically requires compared to other conditions and procedures. The relative weight of each DRG is multiplied by a hospital-specific factor to determine how much a hospital is reimbursed for each discharge. To measure the effectiveness of the consultant and RIH's increased Medicare funding, RIH used an index known as a "casemix index." The casemix index measures the average relative weight of the DRGs used by a hospital for all of its discharges over a given time period.

29. RIH's casemix index increased after the hospital employed the consultant from 1.5823 for FY 1992 to 1.6561 in FY 1993 to 1.6863 in FY 1994. RIH's casemix index remained higher than the 1992 level for the remainder of the period in question. Because RIH's reimbursement for patient discharges was determined in part by the relative weights of the DRGs assigned to those discharges, RIH's rising casemix index reflected RIH's increasing reimbursement from the Medicare program. [redacted]rs.

30. The decision to increase its use of pneumonia codes, such as ICD-9 Code 482.89, that grouped to DRG 79 played a role in RIH's increasing casemix index due to the large difference in relative weight of DRG 79 and DRG 89. For example, in 1993, the relative weight of DRG 79 was 1.751, higher than the hospital's average DRG relative weight as measured by its

casemix index. The relative weight for DRG 89 was 1.1581, substantially lower than the hospital's average.

31. As part of its "training," the consultant suggested coding changes that resulted in changes from the lower paying pneumonia DRG (DRG 89) to the higher paying pneumonia DRG (DRG 79), which is the DRG to which ICD-9 Code 482.89 groups. On information and belief, RIH's consultant suggested changes in the coding for specific pneumonia patients that increased RIH's reimbursement much more frequently than it suggested changes that lowered RIH's reimbursement.

32. [redacted]. At a coding meeting in 1993, RIH coders were falsely told to code pneumonia patients to higher paying codes based on lab results and medications prescribed, rather than to code based on the physician diagnosis as stated in the medical record. The stated purpose of this advice was to select ICD-9 codes that grouped to the higher paying DRG.

33. After RIH began using the outside coding consultant and disseminated the false information regarding proper coding, its use of ICD-9 Code 482.89 more than tripled. Despite this significant increase, RIH took no action to determine the cause of the change. Further, RIH took no action to investigate the dramatic increase from 1993 to 1994 or the significant annual changes between 1994 and 1997 in RIH's use of ICD-9 Code 482.89. [redacted] action.

34. In 1995, RIH rehired a former employee to be coding supervisor. Upon her arrival, she "immediately discovered incorrect coding based on clinical notes without a conclusive diagnosis given by the physician." Further, she reported that she attempted to correct the erroneous coding. No attempt was made to repay the incorrectly coded records in violation of 42 U.S.C. § 1320a-7b (a)(3). In April 1997, this employee conducted an audit of the hospital's pneumonia coding for patient discharges in 1996 and early 1997. During this audit, she discovered that the same false coding continued. The coding staff told her that the false coding was the result of instructions received from the consultant employed by the hospital in 1993. The coding supervisor concluded that other hospital personnel used an interpretation of the coding rules that was "not substantiated in the regulatory manuals; i.e., Coding Clinic." The coding supervisor reported this information to her supervisor in May 1997.

35. The April 1997 audit showed extensive false coding of pneumonia patients, including patients to whom the hospital had assigned ICD-9 Code 482.89. With respect to one patient, the audit revealed that the hospital had falsely assigned ICD-9 Code 482.89, finding: "Record documents bacterial pneumonia but it is not specified. To use 482.89, must be a specified bacteria for which there is no code." With respect to another patient, who was also falsely coded to ICD-9 Code 482.89, the audit indicated "no causative organism has been identified. 482.89 is for extremely specified bacterias for which there is no code." Another audit finding concluded "[o]rganism must be specified for 482.89."

36. F[redacted]

[redacted] In this memorandum, the coding supervisor stated:

> Coding Clinic, (the only true authoritative source) does not deviate from documentation requirements in the reporting of pneumonia as stated in 3rd quarter, 1994, p.10 and 1988. If the coder feels that the patient has gram-negative pneumonia [one of the higher paying diagnoses], the doctor must be asked to document this diagnosis in the dictated summary.

37. The coding supervisor also reported the audit results to a committee of hospital personnel. Rather than accepting the advice of the coding supervisor, the committee overrode her analysis based on false coding rules (i.e., that discharges could be coded based solely on lab results without proper physician documentation). Of the 13 instances in which the coding supervisor found that the records should have been coded to the lower paying pneumonia DRG, the committee rejected her analysis in 11 of those instances based on false coding rules. The committee agreed, however, that two of the cases were incorrectly coded and should be re-billed to refund the overpayment to Medicare. Soon after issuing the final report on the audit, however, the hospital decided to keep the overpayment even as to the two patients that it recognized to be incorrectly coded and not report the false coding to Medicare, in violation of 42 U.S.C. § 1320a-7b (a)(3).

38. [redacted] Instead, [redacted] to [redacted]ed DRGs. On each of these cost reports, RIH certified that the cost report was "a true, correct and complete statement."

39. The hospital'[redacted]ices and keep the overpayments continued into 1999. In response to the investigation of these claims, RIH, acting

through its parent company Lifespan, prepared a report that attempted to convince the United States that the hospital's code assignments had been proper. The hospital's position was that coders could assign ICD-9 Code 482.89 based on the presence of certain findings, even in the absence of physician specification of the organism that caused the pneumonia. To support this position, the hospital relied on official coding advice from 1988 that was in the form of questions and answers about coding. The hospital, purporting to quote the question in the 1988 coding advice, stated: "The question posed to Coding Clinic in '88' asked, '**when can you use the code 482.8 (Pneumonia, due to other specified bacteria), which groups to a DRG 79, in the absence of a culture confirming the bacteria?**'" Lifespan Report at 10 (emphasis in original). The hospital then listed the findings from the 1988 coding advice. In fact, the actual question in the 1988 coding advice asked: "In what instance would it be appropriate for the <u>physician to use the diagnosis</u> of gram-negative pneumonia, 482.8, Pneumonia due to other specified bacteria, in the absence of confirmatory cultures?" <u>Coding Clinic</u>, Third Quater 1988 at 11 (emphasis added). [redacted]. The hospital's false assertion of the text of the question made it appear that the coding advice told coders that they could use the code whenever these findings were present and thus would support the hospital's argument. For this reason, the hospital's false statement was significant. Moreover, the hospital's false statement was further evidence that the hospital was, at a minimum, reckless as to coding standards.

40. In addition, during the period in question, RIH personnel involved in assigning codes to Medicare patient files prepared attestations for physicians regarding the diagnosis

assigned to the patient discharge. Each attestation contained the numerical ICD-9 code assigned and a description of the condition. RIH worded the code description for discharges coded as ICD-9 Code 482.89 in ways that disguised the true meaning of the diagnosis code, so that treating physicians would not object to the assignment of ICD-9 Code 482.89. For example, RIH would frequently describe ICD-9 Code 482.89 as "Bacterial Pneumonia." This was incorrect because the correct description of ICD-9 Code 482.89 is "Pneumonia due to other specified bacteria." Moreover, it was misleading to the physicians because the fact that the patient had bacterial pneumonia does not mean that ICD-9 Code 482.89 was the proper code. In fact, if the patient's diagnosis was bacterial pneumonia without further specification, the proper code was ICD-9 Code 482.9, which groups to DRG 89, the lower paying DRG.

41. The United States did not become aware of facts alleged above material to the rights of action asserted below until at the [redacted].

**COUNT I**
**FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)**

42. Paragraphs 1 through 41 are realleged and incorporated by reference as though fully set forth herein.

43. Between at least October 1, 1992 and at least December 1996, RIH knowingly presented, or caused others to present, to an officer, employee or agent of the United States Government false or fraudulent claims for payment or approval in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1).

44. Because of the defendant's acts, the Government sustained damages in an amount to be determined at trial.

**COUNT II**
**FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(2)**

45. Paragraphs 1 through 41 are realleged and incorporated by reference as though fully set forth herein.

46. Between at least October 1, 1992 and at least December 1996, RIH knowingly made, used, or caused to be made, or used false records and statements to get false or fraudulent claims paid or approved by the Government in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2).

47. Because of the defendant's acts, the Government sustained damages in an amount to be determined at trial.

**COUNT III**
**FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(7)**

48. Paragraphs 1 through 41 are realleged and incorporated by reference as though fully set forth herein.

49. Between at least 1995 and at least 1997, RIH knowingly made, used, or caused to be made, or used false records and statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Government in violation of the False Claims Act, 31 U.S.C. § 3729(a)(7).

50. Because of the defendant's acts, the Government sustained damages in an amount to be determined at trial.

**COUNT IV**
**UNJUST ENRICHMENT**

51. Paragraphs 1 through 41 are realleged and incorporated by reference as though fully set forth herein.

52. Due to RIH's conduct, and the conduct of persons acting on its behalf, RIH has been unjustly enriched with federal monies that in good conscience it should not be allowed to retain.

53. RIH has been unjustly enriched to the detriment of the United States in an amount to be determined at trial.

**COUNT V**
**PAYMENT BY MISTAKE**

54. Paragraphs 1 through 41 are realleged and incorporated by reference as though fully set forth herein.

55. Due to RIH's conduct, and the conduct of persons acting on its behalf, the United States has erroneously paid Medicare claims submitted by RIH.

56. As a result of this conduct, the United States has been damaged in an amount to be determined in a trial of this action.

**COUNT VI**
**COMMON LAW RECOUPMENT**

57. Paragraphs 1 through 41 are realleged and incorporated by reference as though fully set forth herein.

58. This is a claim for common law recoupment for the recovery of monies unlawfully paid by the United States to RIH contrary to statute or regulation.

59. The United States paid to RIH certain sums of money to which RIH was not entitled. RIH is thus liable under the common law of recoupment to account and return to the United States such amounts, which are to be determined at trial.

## CONCLUSION

WHEREFORE, Plaintiff United States demands and prays that judgment be entered in its favor and against RIH as follows:

1. Under Counts I, II, and III for triple damages, civil penalties, and costs;

2. Under Counts IV, V, and VI for damages in an amount to be determined at trial, plus interest and costs; and

3. For all other relief to which the Plaintiff may be entitled.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

Keith Dobbins

MICHAEL F. HERTZ
JOYCE R. BRANDA
KEITH E. DOBBINS
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261
Ben Franklin Station
Washington, DC 20044
Telephone: 202-514-6314
Facsimile: 202-307-3852

Dated: November 19, 2002

"6"

CHUBB

Chubb Group of Insurance Companies
82 Hopmeadow Street
P.O. Box 2002
Simsbury, CT 06070-7683
Phone: 860.408.2000 • Fax: 860.408.2002
www.chubb.com

**VIA FACSIMILE AND FIRST CLASS MAIL**

September 10, 2003

Roland C. Loranger
Lifespan Corporation
The CORO Building, Suite 170
167 Point Street
Providence, RI 02903

| | | |
|---|---|---|
| RE: | INSURED: | Lifespan Corporation |
| | POLICY NO: | 751-080581-97 |
| | CLAIM NO: | 16962 |
| | SUBJECT: | USA ex rel. Health Outcomes Technologies v. Rhode Island Hospital |

Dear Mr. Loranger:

I am writing in follow up to our conference call of September 5, 2003 with regard to the above-cited matter. During that conference call, I was made aware that in August of 1998, Lifespan Corporation ("Lifespan") had put Executive Risk Indemnity Inc. ("ERII") on notice of a subpoena issued by the U.S. Department of Health and Human Services, Office of the Inspector General to the Custodian of Records of Rhode Island Hospital dated March 23, 1998 (the "Subpoena"). The Subpoena indicated that the government was conducting "an investigation of possible false or otherwise improper claims for payment under Title XVIII (Medicare) of the Social Security Act." At the time ERII received notice of the Subpoena, ERII acknowledged this matter as notice of potential claim under the Directors, Officers and Trustees Liability Insurance Including Healthcare Organization Reimbursement Policy issued to Lifespan for the Policy Period October 1, 1997 to October 1, 1998. Pursuant to the terms, conditions and limitations of that Policy, any Claim subsequently arising out of the Wrongful Acts described in the notice of potential claim, shall be a Claim deemed made during the Policy Period. See Section IV. Conditions (F)(2).

As we discussed during our September 5, 2003 conference call and as a review of the USA ex rel. Health Outcomes Technologies v. Rhode Island Hospital (the "Litigation") reveals, the Litigation arises out of the Wrongful Acts about which ERII was previously put on notice during the October 1, 1997 to October 1, 1998 Policy. As such, any potential for coverage for the Litigation must be evaluated under

the terms, conditions and limitations of the October 1, 1997 to October 1, 1998 Policy. I would ask that you use the above-cited Claim and Policy Numbers which correspond with the initial notice of the Subpoena and the October 1, 1997 to October 1, 1998 Policy Period in all future correspondence to ERII with regard to this matter.

The Directors, Officers and Trustees Liability Insurance, Including Healthcare Organization Reimbursement Policy issued by ERII to Lifespan for the Policy Period October 1, 1997 to October 1, 1998 (the "Policy"), is an indemnity policy which provides coverage to the Insureds, as defined in the Policy, for Claims made against the Insureds for Wrongful Acts subject to all Policy terms, conditions and limitations. The Policy affords coverage in connection with Claims against Lifespan Corporation, its Subsidiaries as that term is defined in the Policy and its Insured Persons. Rhode Island Hospital is a Subsidiary of Lifespan Corporation and thus an Insured Entity under the Policy. Payment of Loss under the Policy is subject to a $100,000 retention. In this regard, the $100,000 retention would have to be satisfied before ERII would be liable to pay any Loss. Any Defense Expenses incurred and otherwise covered under the Policy shall be first applied against the $100,000 retention. Any coverage afforded under the Policy would be subject to Policy Conditions IV(C)(1) which provides that $25,000,000 shall be the maximum aggregate Limit of Liability of ERII for all Claims made during the Policy Period.

Please appreciate that as this is a reimbursement policy, no definitive coverage analysis can be made until the issues raised in the matter have been resolved. Our analysis is necessarily based solely upon the unsubstantiated allegations made and should in no way be construed as an independent assessment by us of their merits. In addition, these views are not intended by any means to be exhaustive or exclusive and we expressly reserve all of ERII's rights under the Policy or otherwise to raise additional policy terms and conditions when appropriate.

Plaintiff purports to state claims for violation of the False Claims Act, unjust enrichment, payment by mistake and common law recoupment. In connection with these claims, plaintiff seeks damages, treble damages and penalties.

The allegations raised implicate Section III. Exclusion (A)(1) and (2) which provides in part that except for Defense Expenses, ERII shall not pay Loss for Claims brought about or contributed to in fact (1) by any dishonest or fraudulent act or omission or any willful violation of any statute, rule or law by any Insured or (2) by any Insured gaining any profit, remuneration or advantage to which such Insured was not legally entitled.

Plaintiff also seeks treble damages and penalties. The definition of Loss in Section II. Definitions (G), states that Loss shall not include punitive or exemplary damages, the multiplied portion of any multiple damages award, fines, taxes, penalties, or matters which are uninsurable under the law pursuant to which the Policy shall be construed.

The only potential damages available under the False Claims Act and related common law theories alleged in the Litigation constitute disgorgement of an amount wrongfully received, multiplied damages of such an amount and/or penalties. As noted above, none of those categories of payments is potentially

covered under the Policy.[1] As such, ERII is not in a position to contribute toward any settlement of the Litigation.

However, and subject to a full and complete reservation of rights, the Policy will provide reimbursement for Defense Expenses subject to the Policy's $100,000 per Claim retention. In this regard, please note that Section III. Exclusion (A) further provides that "each Insured agrees that, if it is finally established that the Underwriter has no liability to an Insured for Loss in connection with any Claim by reason of this III. EXCLUSION (A), such Insured will repay the Underwriter upon demand all Defense Expenses paid on behalf of such Insured in connection with such Claim."

As we have previously discussed, please provide me with copies of all Defense Expense invoices received an paid by Lifespan to date in connection with the Litigation as well as copies of all future invoices on a current basis. As previously noted, ERII requires compliance with our Billing and Reporting Guidelines, a copy of which was provided to you with our letter dated June 26, 2003. Please let me know if you would like another copy of those Billing and Reporting Guidelines.

The allegations raised may give rise to coverage under another policy, such as a policy of comprehensive general liability insurance. Pursuant to the Policy Section IV., Conditions (B), the Policy is excess of and will not contribute with any other existing insurance including, but not limited to, any insurance under which there is a duty to defend, unless such other policy is specifically in excess of the Policy. In that regard, please advise whether there are any other policies of insurance available to respond to the Complaint, what steps have been taken to secure coverage on behalf of the Insured under any other policy of insurance, and the coverage position, if any, of any such other carrier. Please provide copies of all potentially applicable insurance policies and the coverage positions of the respective insurance carriers when available.

For the aforementioned reasons, ERII must reserve all of its rights and defenses under the Policy and under applicable law. By doing so, ERII is not denying coverage under the Policy; instead, ERII is of the position that the allegations raised may give rise to liabilities for which the Policy would not provide coverage. As this matter progresses, other exclusions and defenses may become applicable, and one or more of the provisions cited above may become inapplicable.

We expressly reserve all rights under the policy and/or available at law to deny coverage and/or to rescind the policy on additional or alternative bases as other terms, conditions, exclusions, endorsements, and provisions of the policy, including representations, statements, declarations, and omissions in connection with the application, are found to be applicable.

We request that you keep us abreast of developments in the above matter and forward any significant documentation and correspondence you may generate or receive relating to this matter. I look forward to continuing to work with you. Should you have any questions regarding ERII's position, or care to discuss any of the foregoing matter, please do not hesitate to contact me.

---

[1] Notably, numerous courts have found that disgorgement, or restitutionary payments, are uninsurable as a matter of law as against public policy. I have not included an extensive discussion of this point in this letter, but would be happy to do so at your request.

Roland C. Levranger
September 10, 2003
Page 4

Very truly yours,

Kimberly Dean Coran

Kimberly Dean Coran, J.D.
Assistant Vice President
Senior Claims Examiner
Direct Dial: (703) 356-4682
Fax: (703) 356-4683
E-mail: coranjk@chubb.com

cc: Luann Ottilo
Victor O. Schinnerer & Company, Inc.
Two Wisconsin Circle
Suite 1200
Chevy Chase, MD 20815-7022