IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA, :
ex rel. HEALTH OUTCOMES :
TECHNOLOGIES, :

Plaintiff, :

v. : CIVIL ACTION NO. 01-243-ML

RHODE ISLAND HOSPITAL :

Defendant. :

RECEIVED NOV 20 2002 U.S. District Court District of Rhode Island

**COMPLAINT**

The United States of America states as follows:

**Introduction**

1. This is an action brought by the United States of America against Rhode Island Hospital for triple damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, and, in the alternative, for damages for unjust enrichment, payment by mistake, and recoupment.

2. In sum, this Complaint alleges that Rhode Island Hospital knowingly submitted claims to Medicare that were improper and inaccurate because they misstated the patient's diagnosis, and that, by submitting those improper claims, Rhode Island Hospital received more money from Medicare than it should have.

**Jurisdiction and Venue**

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1345, 28 U.S.C. § 1331, and 31 U.S.C. § 3732(a).

4. Venue in this Court is proper under 28 U.S.C. § 1391 (b) & (c) and 31 U.S.C. § 3732(a).

[redacted]

**The Parties**

5. The Plaintiff is the United States of America, on behalf of the United States Department of Health and Human Services ("HHS").

6. Relator Health Outcomes Technologies is a Pennsylvania corporation with its principal place of business at 350 South Main Street, Suite 109, Doylestown, Pennsylvania 18901.

7. Defendant Rhode Island Hospital ("RIH") is a Rhode Island corporation that owns and operates a hospital in Providence, Rhode Island. RIH's agent for service of process is Roland C. Loranger at 593 Eddy Street, Providence, RI 02903.

8. Medicare is a federally funded program that helps people over age 65 and disabled people pay their medical bills. One part of Medicare, known as "Part A", pays hospitals for their treatment of eligible Medicare beneficiaries.

9. The United States, through HHS, and its agency, the Centers for Medicare and Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration ("HCFA")), runs the Medicare program, including Part A. At all relevant times, the United States administered the Medicare Part A Program in Rhode Island through a contract with a private insurance company, called a Fiscal Intermediary. The Fiscal Intermediary for RIH was Blue Cross and Blue Shield of Rhode Island ("BCBS"). Under the contract, BCBS reviews, approves, and pays Medicare bills called "claims" received from hospitals that treat Medicare patients. Those claims are paid with federal funds. BCBS's offices are located at 444 Westminster St., Providence, Rhode Island 02903-3279.

10. RIH is a Medicare provider. RIH has an agreement with Medicare that it may treat Medicare patients, and bill Medicare for that treatment, but only if it bills Medicare according to Medicare rules.

**Medicare Inpatient Billing**

11. When RIH billed Medicare for an inpatient, that is, someone who stayed over a day in the hospital, it would send a claim to BCBS asking to be paid by Medicare.

12. The amount Medicare pays a hospital for treating a Medicare inpatient is based in large part on the illness or condition that led to the patient's admission to the hospital or was the patient's illness or condition that was principally treated by the hospital. Medicare calls this the "principal diagnosis." Medicare also looks at whether the patient had other problems that were treated at the hospital. Those other problems are called "complications and comorbidities" and are represented by a "secondary diagnosis."

13. When hospitals, including RIH, submit claims for treating Medicare inpatients, they assign code numbers representing the diagnoses for that patient. Those code numbers come from a book called the "International Classification of Diseases, 9th Edition," and are referred to as "ICD-9" codes.

14. It is important that the code numbers chosen by the hospital be accurate, because those numbers will determine how much money the hospital will be paid by Medicare for treating the patient covered by that claim. Further, because the patient's medical records are not submitted with the claim, the Fiscal Intermediary and CMS rely on the accuracy of the hospital's selection of the correct code. The hospital is responsible for making sure that the claims it submits to Medicare are correct.

15. CMS has established a scale of payments to hospitals called "diagnostic related groups" ("DRGs"). When a Medicare claim is submitted, the Fiscal Intermediary assigns the ICD-9 codes listed by the hospital to the related DRG. In other words, each ICD-9 code usually "groups" to a particular DRG. That DRG determines how much the hospital is paid. For example, most claims for pneumonia patients (and most pneumonia ICD-9 codes) result in assignment of DRG 89. Other pneumonia cases (and other ICD-9 codes), for which treatment is more resource intensive, result in assignment of DRG 79, which pays more money to the hospital than DRG 89.

16. The most important factor in determining what DRG is assigned to a claim is the ICD-9 code chosen by the hospital as the principal diagnosis. Therefore, a hospital may increase the money it gets from Medicare by improperly putting the wrong code on a claim for the principal diagnosis.

17. Hospitals, including RIH, are required to choose ICD-9 codes based on the diagnostic statements of a patient's treating physician in that patient's medical record. See 42 C.F.R. § 482.24 (c); Coding Clinic, Second Quarter 1990 at 14.

**Billing and Pneumonia Patients**

18. The ICD-9 codes include several different codes for pneumonia. The code that applies depends on the cause of the pneumonia. For example, ICD-9 Code 486 applies where the patient has pneumonia, but the cause of the pneumonia is not specified by the physician. ICD-9 Code 482.3 applies when the physician has documented that the cause of the pneumonia is streptococcus bacteria. ICD-9 Code 482.89 applies when the physician has documented a

specific bacteria that caused the pneumonia, but that bacteria is not listed in any of the other pneumonia codes.

19. Most of the ICD-9 codes listed for pneumonia cases, when listed on Medicare claims as the principal diagnosis, normally result in payments to a hospital under DRG 89. However, a few of them, including ICD-9 Code 482.89, normally result in a hospital's receiving a higher payment under DRG 79.

20. Since the specific etiological agent causing a patient's pneumonia is frequently not identified at all and the most common causes of pneumonia are listed elsewhere, ICD-9 Code 482.89, which stands for cases where the physician has identified the specific bacteria causing the pneumonia but that bacteria is not listed in the codes, is rarely used by hospitals. From the time that ICD-9 Code 482.89 was created in October 1992 through 1996, most hospitals in the United States assigned ICD-9 Code 482.89 to approximately 2 to 3% of their pneumonia cases.

21. Unlike the typical hospital however, from Fiscal Year 1993 through Fiscal Year 1996, RIH assigned ICD-9 Code 482.89 to approximately 5.5%, 17.9%, 10.3%, and 5.4% of its Medicare pneumonia cases respectively, including many cases where the physician did not identify a specific bacteria as the cause of the patient's illness, contrary to the definition of ICD-9 Code 482.89. Following widespread news of a government investigation of the use of ICD-9 Code 482.89 in 1997, RIH's use of the code dropped to less than two percent of all pneumonia cases.

**Improper Conduct**

22. Between at least October 1992 and at least December 1996, RIH engaged in a pattern and practice of submitting false and fraudulent claims for payment to Medicare (through

the Fiscal Intermediary, BCBS) knowing that these billings were false, acting in reckless disregard for the truth, or with deliberate ignorance of their truth or falsity, by improperly assigning ICD-9 Code 482.89 to Medicare claims for its pneumonia patients. This damaged the United States by causing it to pay more to RIH than the amount to which RIH was actually entitled.

23. It was a part of this pattern and practice to submit claims to Medicare that listed ICD-9 Code 482.89 as the patient's principal diagnosis where no specific bacteria had been determined by the physician to be the cause of the patient's pneumonia.

24. It was further a part of this pattern and practice to submit claims to Medicare that listed ICD-9 Code 482.89 as the patient's principal diagnosis when there was no such diagnosis made by the treating physician, as reflected in the patient's medical record.

25. RIH submitted these claims despite the fact that it knew that it was improper to use ICD-9 Code 482.89 when the medical record lacked sufficient physician documentation of the cause of the patient's condition.

26. Further, RIH knew at the time that it submitted these claims that ICD-9 Code 482.89 could only be used properly when the physician specified in the medical record the bacteria that caused the patient's pneumonia and the specified bacteria was not elsewhere listed in the ICD-9 codes.

27. Beginning in 1993, RIH employed an outside consultant to review and "optimize" RIH's use of ICD-9 codes generally with the goal of increasing RIH's Medicare reimbursement by consistently using codes that grouped to higher paying DRGs. Under the contract, the consultant was reimbursed 25% to 30% of any specific coding increases that it proposed. If the consultant

suggested decreases in coding, it was not reimbursed at all for the suggestion. As a result of RIH's use of this consultant, it consistently coded patient discharges to higher paying DRGs and increased the money that it received from Medicare.

28. Under the Medicare payment system, each DRG is assigned a relative weight that measures the resources the diagnosed condition or procedure typically requires compared to other conditions and procedures. The relative weight of each DRG is multiplied by a hospital-specific factor to determine how much a hospital is reimbursed for each discharge. To measure the effectiveness of the consultant and RIH's increased Medicare funding, RIH used an index known as a "casemix index." The casemix index measures the average relative weight of the DRGs used by a hospital for all of its discharges over a given time period.

29. RIH's casemix index increased after the hospital employed the consultant from 1.5823 for FY 1992 to 1.6561 in FY 1993 to 1.6863 in FY 1994. RIH's casemix index remained higher than the 1992 level for the remainder of the period in question. Because RIH's reimbursement for patient discharges was determined in part by the relative weights of the DRGs assigned to those discharges, RIH's rising casemix index reflected RIH's increasing reimbursement from the Medicare program. The financial impact of these increases was in the millions of dollars.

30. The decision to increase its use of pneumonia codes, such as ICD-9 Code 482.89, that grouped to DRG 79 played a role in RIH's increasing casemix index due to the large difference in relative weight of DRG 79 and DRG 89. For example, in 1993, the relative weight of DRG 79 was 1.751, higher than the hospital's average DRG relative weight as measured by its

casemix index. The relative weight for DRG 89 was 1.1581, substantially lower than the hospital's average.

31. As part of its "training," the consultant suggested coding changes that resulted in changes from the lower paying pneumonia DRG (DRG 89) to the higher paying pneumonia DRG (DRG 79), which is the DRG to which ICD-9 Code 482.89 groups. On information and belief, RIH's consultant suggested changes in the coding for specific pneumonia patients that increased RIH's reimbursement much more frequently than it suggested changes that lowered RIH's reimbursement.

32. Beginning in at least 1993, RIH gave its coders false information regarding the proper method of coding pneumonia patients. At a coding meeting in 1993, RIH coders were falsely told to code pneumonia patients to higher paying codes based on lab results and medications prescribed, rather than to code based on the physician diagnosis as stated in the medical record. The stated purpose of this advice was to select ICD-9 codes that grouped to the higher paying DRG.

33. After RIH began using the outside coding consultant and disseminated the false information regarding proper coding, its use of ICD-9 Code 482.89 more than tripled. Despite this significant increase, RIH took no action to determine the cause of the change. Further, RIH took no action to investigate the dramatic increase from 1993 to 1994 or the significant annual changes between 1994 and 1997 in RIH's use of ICD-9 Code 482.89. Had RIH investigated either of these occurrences, it would have learned that it was improperly using ICD-9 Code 482.89 and could have taken corrective action.

34. In 1995, RIH rehired a former employee to be coding supervisor. Upon her arrival, she "immediately discovered incorrect coding based on clinical notes without a conclusive diagnosis given by the physician." Further, she reported that she attempted to correct the erroneous coding. No attempt was made to repay the incorrectly coded records in violation of 42 U.S.C. § 1320a-7b (a)(3). In April 1997, this employee conducted an audit of the hospital's pneumonia coding for patient discharges in 1996 and early 1997. During this audit, she discovered that the same false coding continued. The coding staff told her that the false coding was the result of instructions received from the consultant employed by the hospital in 1993. The coding supervisor concluded that other hospital personnel used an interpretation of the coding rules that was "not substantiated in the regulatory manuals; i.e., Coding Clinic." The coding supervisor reported this information to her supervisor in May 1997.

35. The April 1997 audit showed extensive false coding of pneumonia patients, including patients to whom the hospital had assigned ICD-9 Code 482.89. With respect to one patient, the audit revealed that the hospital had falsely assigned ICD-9 Code 482.89, finding: "Record documents bacterial pneumonia but it is not specified. To use 482.89, must be a specified bacteria for which there is no code." With respect to another patient, who was also falsely coded to ICD-9 Code 482.89, the audit indicated "no causative organism has been identified. 482.89 is for extremely specified bacterias for which there is no code." Another audit finding concluded "[o]rganism must be specified for 482.89."

36. Following the audit, the coding supervisor issued a directive to her coding staff that, when a physician does not give sufficient documentation of the cause of the pneumonia, one

of the lower paying ICD-9 codes should be used. In this memorandum, the coding supervisor stated:

> Coding Clinic, (the only true authoritative source) does not deviate from documentation requirements in the reporting of pneumonia as stated in 3rd quarter, 1994, p.10 and 1988. If the coder feels that the patient has gram-negative pneumonia [one of the higher paying diagnoses], the doctor must be asked to document this diagnosis in the dictated summary.

37. The coding supervisor also reported the audit results to a committee of hospital personnel. Rather than accepting the advice of the coding supervisor, the committee overrode her analysis based on false coding rules (i.e., that discharges could be coded based solely on lab results without proper physician documentation). Of the 13 instances in which the coding supervisor found that the records should have been coded to the lower paying pneumonia DRG, the committee rejected her analysis in 11 of those instances based on false coding rules. The committee agreed, however, that two of the cases were incorrectly coded and should be re-billed to refund the overpayment to Medicare. Soon after issuing the final report on the audit, however, the hospital decided to keep the overpayment even as to the two patients that it recognized to be incorrectly coded and not report the false coding to Medicare, in violation of 42 U.S.C. § 1320a-7b (a)(3).

38. Despite its knowledge in at least 1995 and 1997 that it had made false assignments of ICD-9 Code 482.89, RIH did not refund the overpayments. Instead, it continued to submit cost reports reporting the improperly claimed DRGs. On each of these cost reports, RIH certified that the cost report was "a true, correct and complete statement."

39. The hospital's scheme to conceal its false coding practices and keep the overpayments continued into 1999. In response to the investigation of these claims, RIH, acting

through its parent company Lifespan, prepared a report that attempted to convince the United States that the hospital's code assignments had been proper. The hospital's position was that coders could assign ICD-9 Code 482.89 based on the presence of certain findings, even in the absence of physician specification of the organism that caused the pneumonia. To support this position, the hospital relied on official coding advice from 1988 that was in the form of questions and answers about coding. The hospital, purporting to quote the question in the 1988 coding advice, stated: "The question posed to Coding Clinic in '88' asked, '**when can you use the code 482.8 (Pneumonia, due to other specified bacteria), which groups to a DRG 79, in the absence of a culture confirming the bacteria?**'" Lifespan Report at 10 (emphasis in original). The hospital then listed the findings from the 1988 coding advice. In fact, the actual question in the 1988 coding advice asked: "In what instance would it be appropriate for the <u>physician to use the diagnosis</u> of gram-negative pneumonia, 482.8, Pneumonia due to other specified bacteria, in the absence of confirmatory cultures?" <u>Coding Clinic</u>, Third Quater 1988 at 11 (emphasis added). As is clear from the text of the real question, the findings listed are instances when it would be appropriate for a physician to make a particular diagnosis, not instances when coders could select a code. The hospital's false assertion of the text of the question made it appear that the coding advice told coders that they could use the code whenever these findings were present and thus would support the hospital's argument. For this reason, the hospital's false statement was significant. Moreover, the hospital's false statement was further evidence that the hospital was, at a minimum, reckless as to coding standards.

40. In addition, during the period in question, RIH personnel involved in assigning codes to Medicare patient files prepared attestations for physicians regarding the diagnosis

assigned to the patient discharge. Each attestation contained the numerical ICD-9 code assigned and a description of the condition. RIH worded the code description for discharges coded as ICD-9 Code 482.89 in ways that disguised the true meaning of the diagnosis code, so that treating physicians would not object to the assignment of ICD-9 Code 482.89. For example, RIH would frequently describe ICD-9 Code 482.89 as "Bacterial Pneumonia." This was incorrect because the correct description of ICD-9 Code 482.89 is "Pneumonia due to other specified bacteria." Moreover, it was misleading to the physicians because the fact that the patient had bacterial pneumonia does not mean that ICD-9 Code 482.89 was the proper code. In fact, if the patient's diagnosis was bacterial pneumonia without further specification, the proper code was ICD-9 Code 482.9, which groups to DRG 89, the lower paying DRG.

41. The United States did not become aware of facts alleged above material to the rights of action asserted below until at the earliest June 1998, when RIH produced business records revealing these facts in response to a subpoena.

**COUNT I**
**<u>FALSE CLAIMS ACT</u>**
**<u>31 U.S.C. § 3729(a)(1)</u>**

42. Paragraphs 1 through 41 are realleged and incorporated by reference as though fully set forth herein.

43. Between at least October 1, 1992 and at least December 1996, RIH knowingly presented, or caused others to present, to an officer, employee or agent of the United States Government false or fraudulent claims for payment or approval in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1).

44. Because of the defendant's acts, the Government sustained damages in an amount to be determined at trial.

**COUNT II**
**FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(2)**

45. Paragraphs 1 through 41 are realleged and incorporated by reference as though fully set forth herein.

46. Between at least October 1, 1992 and at least December 1996, RIH knowingly made, used, or caused to be made, or used false records and statements to get false or fraudulent claims paid or approved by the Government in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2).

47. Because of the defendant's acts, the Government sustained damages in an amount to be determined at trial.

**COUNT III**
**FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(7)**

48. Paragraphs 1 through 41 are realleged and incorporated by reference as though fully set forth herein.

49. Between at least 1995 and at least 1997, RIH knowingly made, used, or caused to be made, or used false records and statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Government in violation of the False Claims Act, 31 U.S.C. § 3729(a)(7).

50. Because of the defendant's acts, the Government sustained damages in an amount to be determined at trial.

**COUNT IV**
**UNJUST ENRICHMENT**

51. Paragraphs 1 through 41 are realleged and incorporated by reference as though fully set forth herein.

52. Due to RIH's conduct, and the conduct of persons acting on its behalf, RIH has been unjustly enriched with federal monies that in good conscience it should not be allowed to retain.

53. RIH has been unjustly enriched to the detriment of the United States in an amount to be determined at trial.

**COUNT V**
**PAYMENT BY MISTAKE**

54. Paragraphs 1 through 41 are realleged and incorporated by reference as though fully set forth herein.

55. Due to RIH's conduct, and the conduct of persons acting on its behalf, the United States has erroneously paid Medicare claims submitted by RIH.

56. As a result of this conduct, the United States has been damaged in an amount to be determined in a trial of this action.

**COUNT VI**
**COMMON LAW RECOUPMENT**

57. Paragraphs 1 through 41 are realleged and incorporated by reference as though fully set forth herein.

58. This is a claim for common law recoupment for the recovery of monies unlawfully paid by the United States to RIH contrary to statute or regulation.

59. The United States paid to RIH certain sums of money to which RIH was not entitled. RIH is thus liable under the common law of recoupment to account and return to the United States such amounts, which are to be determined at trial.

## CONCLUSION

WHEREFORE, Plaintiff United States demands and prays that judgment be entered in its favor and against RIH as follows:

1. Under Counts I, II, and III for triple damages, civil penalties, and costs;

2. Under Counts IV, V, and VI for damages in an amount to be determined at trial, plus interest and costs; and

3. For all other relief to which the Plaintiff may be entitled.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

[signature]
MICHAEL F. HERTZ
JOYCE R. BRANDA
KEITH E. DOBBINS
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261
Ben Franklin Station
Washington, DC 20044
Telephone: 202-514-6314
Facsimile: 202-307-3852

Dated: November 19, 2002